KENFORD COMPANY, INC., et al., Respondents-Appellants, v
COUNTY OF ERIE et al., Appellants-Respondents.

Fourth Department, April 12, 1985

### APPEARANCES OF COUNSEL

*Jaeckle, Fleischmann & Mugel* (*John H. Stenger* of counsel), for appellants-respondents.

*Hodgson, Russ, Andrews, Woods & Goodyear* and *Olwine, Connelly, Chase, O'Donnell & Weyher* (*Victor Fuzak* [*Hodgson, Russ*] of counsel), for respondents-appellants.

### OPINION OF THE COURT

DOERR, J.

This appeal presents for our review the extent to which plaintiffs may recover damages following defendant's breach of contract.

In the late 1960s the County of Erie obtained enabling legislation permitting it to finance and construct a sports stadium. Edward Cottrell, a local businessman, put together an assemblage of properties in the Town of Lancaster. Cottrell eventually obtained options to purchase in excess of 700 acres of land, some of which he tried to interest the county in purchasing for the purpose of building a domed stadium facility. Cottrell, who formed plaintiff Kenford Co., Inc., in 1968 (hereinafter Kenford), planned to develop the land surrounding the stadium and he also hoped to acquire a major league baseball franchise to play in the stadium. When Cottrell's efforts to interest the county in buying his land were unsuccessful, he consulted Judge Roy Hofheinz, who had developed the Houston Astrodome. Hofheinz

suggested donating the Lancaster property to the county in exchange for the county permitting Hofheinz and Cottrell to lease or manage the stadium, which was to be built by the county. In May of 1969, Cottrell and Hofheinz formed plaintiff Dome Stadium, Inc. (DSI), which was owned two thirds by Hofheinz and one third by Cottrell. The two also agreed to share the peripheral land development scheme.

In June 1969, the Erie County Legislature passed a resolution authorizing the plan suggested by Hofheinz. Cottrell, as agent for Kenford, thereafter exercised his options on the Lancaster property, paying some $2.6 million for the total assemblage. On August 8, 1969, the county, Kenford, and DSI signed a contract by which Kenford agreed to convey 178 acres of land in exchange for the county's promise to construct a domed stadium facility. The contract further provided that the county would either lease the stadium to DSI for 40 years, or permit DSI to manage the stadium for 20 years in accordance with an attached management agreement, if no acceptable lease could be arranged within three months. Title to the property was duly conveyed, but the parties thereafter failed to agree to lease terms, and the management contract came into being automatically.

The county sought bids on the stadium, but they were $20,000,000 over budget. On August 8, 1970, the county legislature voted to abandon the project. Cottrell unsuccessfully sought to obtain substitute funding. Plaintiffs commenced the instant action alleging breach of contract and seeking specific performance or, alternatively, $90,000,000 in damages. Plaintiffs were granted summary judgment on the issue of liability (*Kenford Co. v County of Erie,* 88 AD2d 758) and a trial was ordered on the issue of damages.[1]

The damage trial lasted nine months, consuming over 25,000 pages of transcript. Plaintiffs attempted to prove that the breach caused them to suffer $495,000,000 in damages, including lost profits on a baseball franchise, a theme park, three hotels, an office park, a golf course, and a specialty retail center. Plaintiffs also sought to recover lost profit on the management contract, loss of appreciation in the value of the land surrounding the stadium site, and out-of-pocket expenses incurred in reliance on the contract. The trial court dismissed Kenford's claims of lost profits on the peripheral land development and the baseball

---

1. Thereafter, plaintiffs were granted permission to increase their ad damnum clause to $495,000,000 (*Kenford Co. v County of Erie,* 93 AD2d 998), but a motion to change venue was denied (97 AD2d 982).

franchise as being too speculative,[2] but the court submitted the other items of damage to the jury, which awarded DSI lost profits of $25.6 million on the management contract. The jury also awarded Kenford $18,000,000 for its lost appreciation in land value and it granted Kenford over $6,000,000 in out-of-pocket expenses. On appeal, the recoverability of all elements is challenged.

## I. LOST PROFITS ON THE PERIPHERAL DEVELOPMENT

In a breach of contract case, the goal of a damage award is to place plaintiff in the position he would have been in absent the breach, no worse but no better (*Western Geophysical Co. v Bolt Assoc.*, 584 F2d 1164, 1172; *Barnes v Brown*, 130 NY 372, 381; *Brown v Lockwood*, 76 AD2d 721, 742-743). Only such damages as are the natural and probable result of the breach may be recovered. Ordinarily, plaintiff may not recover for a collateral enterprise upon which he might have embarked, had defendant not breached the contract (Dunn, Recovery of Damages for Lost Profits § 1.16 [2d ed 1981]; Fuchsberg, 9 Encyc NY Law, Damages, § 24; 36 NY Jur 2d, Damages, § 41; *see, Czarnikow-Rionda Co. v Federal Sugar Refining Co.*, 255 NY 33, 41; *Chapman v Fargo*, 223 NY 32). This rule is derived from the doctrine enunciated in *Hadley v Baxendale* (156 Eng Rep 145, 151). Under this rule, recovery is limited to such damages as may fairly and reasonably have been in the contemplation of the parties when the contract was made (*Kerr S. S. Co. v Radio Corp.*, 245 NY 284). Thus, damages may not be recovered where the consequences of the breach are remote and indirect. "No one is answerable in law for all the remote consequences of his own acts" (36 NY Jur 2d, Damages, § 13, at 29, citing *Hoffman v King*, 160 NY 618; *Coppola v Kraushaar*, 102 App Div 306).

In addition to the foreseeability requirement, to be recoverable " 'damages must be not merely speculative, possible and imaginary, but they must be reasonably certain * * * They may be so uncertain, contingent and imaginary as to be incapable of adequate proof, and then they cannot be recovered because they cannot be proved' " (*Najjar Indus. v City of New York*, 87 AD2d 329, 334, quoting *Wakeman v Wheeler & Wilson Mfg. Co.*, 101 NY 205, 209). Damages may not be awarded on the basis of

---

2. Technically, the court refused to submit these matters to the jury on the ground that various "conditions" to the admissibility of the evidence had not been met. Plaintiff's counsel noted that in striking testimony the court was, in effect, granting a directed verdict as to those claims. We agree that this is what the court did and treat the appeal as if it had dismissed the claims outright rather than merely striking testimony.

conjecture and guesswork (*Schanbarger v Dott's Garage,* 72 AD2d 882, 883; *Schneider v State of New York,* 38 AD2d 628). Damages that are uncertain, contingent, or speculative may not be recovered (*Broadway Photoplay Co. v World Film Corp.,* 225 NY 104; *Briggs v New York Cent. & Hudson Riv. R. R. Co.,* 177 NY 59; *Rochester Lantern Co. v Stiles & Parker Press Co.,* 135 NY 209; *Wakeman v Wheeler & Wilson Mfg. Co., supra; Hewlett v Caplin,* 275 App Div 797, *affd* 301 NY 591; *Strough v Conley,* 257 App Div 1057, *affd* 283 NY 631). It is for the court to determine, in the first instance, whether as a matter of law the damages claimed are too remote to permit recovery (*Fifty States Mgt. Corp. v Niagara Permanent Sav. & Loan Assn.,* 58 AD2d 177; *Motif Constr. Corp. v Buffalo Sav. Bank,* 50 AD2d 718, 719).

■ Application of these rules to the instant case leads to the inescapable conclusion that the trial court properly refused to submit to the jury Kenford's claims pertaining to the peripheral land development and the baseball franchise. Although it was known that Kenford would try to buy a baseball franchise and would try to develop the land surrounding the stadium, it was by no means certain that Kenford would have been successful in doing so or that these enterprises would have thrived. Not all business ventures prove to be profitmaking. Moreover, although Cottrell had ideas for developing the peripheral land, these plans were by no means certain as of August 8, 1969.[3] We know of no precedent for holding a defendant liable for profits lost on collateral matters that are as remote and undeveloped as the plans involved herein (*cf. Contemporary Mission v Famous Music Corp.,* 557 F2d 918 [permitting plaintiff to recover for lost sales on a record following defendant's breach of contract to promote the record, but denying lost profits on a proposed concert tour, etc.]). The office buildings, golf course, and theme park for which plaintiff now seeks lost profits were nothing more than visions at the time the parties entered into the contract. No specific plans had been drawn for any of these ventures. The proposed baseball franchise was equally speculative. It was by no means certain that Cottrell would have been able to purchase a baseball franchise since such a purchase would have required approval of a percentage of league owners. Moreover, it is completely speculative to say that the franchise would have been a profitable one.

---

3. For example, Cottrell's testimony revealed that, as of the contract date, there had been no feasibility study for a theme park and his experts had not yet inspected the golf course site.

## II. LOSS OF APPRECIATION IN PERIPHERAL LAND VALUES

There is no dispute that Kenford suffered a monetary loss in land appreciation as a result of defendant's breach of contract. Defendant's own expert admitted that construction of the dome would have caused the peripheral land to appreciate in value fourfold. Nor can it be doubted that both parties contemplated this appreciation, since the contract itself states that the county expected to receive increased property taxes from the peripheral lands purchased by Cottrell and/or Kenford.[4] Unlike Kenford's specific development plans, which were remote and uncertain at the time of contracting, the purchase of the land was a completed fact of which the county had full notice. Also, while it was uncertain whether any particular development scheme would prove profitable, there was no possibility of the land depreciating in value. Thus, damage was certain. It is well settled in New York that in a breach of contract case a plaintiff may recover not only losses sustained, but also gains prevented (*Lieberman v Templar Motor Co.*, 236 NY 139; *Witherbee v Meyer,* 155 NY 446; *Wakeman v Wheeler & Wilson Mfg. Co.,* 101 NY 205, *supra*), and where damage is certain, recovery will not be denied because the amount is uncertain; the breaching party bears the risk of the uncertainty created by his breach (*Bigelow v RKO Radio Pictures,* 327 US 251, 264-265; *Story Parchment Co. v Paterson Parchment Paper Co.,* 282 US 555; *Lee v Seagram & Sons,* 552 F2d 447, 455-456; *Berley Indus. v City of New York,* 45 NY2d 683, 687; *Spitz v Lesser,* 302 NY 490, 494; *Wakeman v Wheeler & Wilson Mfg. Co., supra,* p 209). In our view, Kenford's loss was both foreseeable and certain, and plaintiff is entitled to recover for its loss.[5]

---

**4.** The contract obligated the parties to attempt to negotiate a lease calling for $63.75 million in revenues over 40 years, the revenues to be derived from, *inter alia,* "increased real property taxes * * * generated by the peripheral lands and development thereof (peripheral lands shall mean those lands presently owned, contracted for or hereafter acquired by Edward H. Cottrell or Kenford)".

**5.** We disagree with the view espoused in the dissenting opinion suggesting that the court take this opportunity to adopt the disproportionate recovery test suggested by the Restatement (Second) of Contracts. Were we to agree that the rule should be adopted, we would not apply it so as to deny plaintiff a recovery of its loss of appreciation in land value in the instant case. The Restatement, itself, notes that a court should limit damages that are otherwise recoverable only if there is "an extreme disproportion" between the loss and the benefit to be derived by defendant under the contract (Restatement [Second] of Contracts § 351 comment f). Thus, for example, one breaching a contract to deliver machinery should not be responsible for plaintiff's subsequent lost profits, which are greatly in excess of the consideration defendant would have derived from full performance (Restatement [Second] of Contracts § 351 comment f, illustration 17). This analysis has no application to the facts

■ Nevertheless, we conclude that the award of damages on this issue must be reversed because it was based on improper appraisal evidence. Plaintiff's appraiser valued the land as of projected completion dates ranging from 1973 to 1979 and based his estimates on the assumption that the property was improved with the specific items that we now find speculative as a matter of law, i.e., theme park, office buildings, and golf course. Plaintiff should have produced appraisal testimony indicating what the land would have been worth as raw acreage immediately following construction of the stadium. Any further appreciation to the land resulting from theme parks and the like makes the evidence of value too speculative to permit recovery. We conclude that a new trial is warranted on this issue because the experts were in agreement that plaintiff suffered some loss, and because the motion to strike plaintiff's evidence was made after both sides had rested. Moreover, had the trial court correctly granted the motion, plaintiff could have moved to reopen the case to present proper proof. On this view of the record, we find a new trial appropriate (*see, Borne Chem. Co. v Dictrow,* 85 AD2d 646, 650-651 [granting a new trial where the parties and the court misunderstood the law]).

---

at hand, since a recovery of a few million dollars is not out of proportion to the benefit defendant would have derived from performance of the contract. Defendant was given title to 178 acres of land and would have had the opportunity to realize substantial income from both stadium operations and increased tax revenues. Defendant has not obtained these benefits only because defendant chose to breach the contract. The proper test is not what defendant actually derived from the contract, but what benefit it would have derived from performance (Fuller & Perdue, *The Reliance Interest in Contract Damages: 1,* 46 Yale LJ 52, 88, n 58 [1936]; dissent, infra, n 5).

We also reject the argument that there is no reason to treat lost appreciation in land value differently from lost profits on the theme park, etc. The principal reason for denying lost profits on the latter is that there is no way of knowing whether these proposed ventures would have been profitable, and thus plaintiffs' proof cannot meet the certainty requirement of the lost profits test (*Wakeman v Wheeler & Wilson Mfg. Co.,* 101 NY 205, 217; *see infra,* n 8). Loss of appreciation in land value, by contrast, was conceded by defendant.

We also find unpersuasive the dissenters' reasoning that county officials did not "contemplate" the liability now at issue because, had they done so, they would have inserted a standard clause limiting their liability (*see infra,* dissenting opn, ns 2, 7). It is speculative to say that such a clause would have been proposed and more speculative to assume that plaintiffs would have agreed to it. For example, on the summary judgment motion, Special Term noted that the county desired to insert a cost limitation in the contract, but plaintiffs refused to agree to that term.

Finally, we know of no legal support for the suggestion implicit in the dissent that a party who enters into an allegedly improvident contract should, perforce, be rescued from its own incaution. Such a bailout is particularly inappropriate in the case at bar where both parties to the contract were sophisticated entities represented by counsel and the dealings were at arm's length.

Upon retrial, the proper measure of damages will be the value of the land as raw acreage following construction of the dome less the value of the land when purchased. The parties' experts may develop a preconstruction estimate of value using familiar principles of valuation, notably the market data approach. The sales price of the subject property may be the best evidence of value (*Grant Co. v Srogi*, 52 NY2d 496, 511), particularly the early sales before it was widely known that Cottrell was acquiring an assemblage. A postconstruction estimate of value may similarly be derived by using the market data approach. The experts may rely on the appreciation experienced by lands surrounding other major developments in western New York as well as in other similar metropolitan areas. We stress, however, that as nearly as possible, the comparables to be relied upon should be large parcels of raw acreage.[6] The objective, after all, is simply to ascertain fair market value, i.e., what a willing buyer would pay a willing seller for the property (*Grant Co. v Srogi, supra,* p 510), viewing the property exactly as it was in the early 1970s, except assuming that it was located on the periphery of a domed stadium.[7]

### III. LOST PROFITS ON THE MANAGEMENT CONTRACT

The issue of DSI's lost profits on the management contract involves two questions: whether an unestablished business may recover lost profits in New York and, if so, whether plaintiff's proof was adequate.

#### A. Per Se Rule v Rule of Evidence

We begin our analysis by noting that we found no case from a New York State court permitting a recovery of lost profits to a new business. The seminal case on the subject is *Cramer v Grand Rapids Show Case Co.* (223 NY 63). The defendant in *Cramer* breached its contract to deliver furniture to plaintiffs thereby preventing the latter from opening their ladies clothing store in a timely fashion. In reversing an award of lost profits,

---

**6.** For example, plaintiff's expert relied on small parcels and valued the land on a square foot basis rather than an acreage basis, resulting in an inflated estimate of value.

**7.** We note that the county's expert used proper methodology by developing a preconstruction value based on comparable sales in the area during the late 1960s. He also developed a postconstruction value by examining the experience of other local properties that surrounded major western New York developments such as Rich Stadium and the SUNY campus. Using this data he arrived at a preconstruction value of $1,100 per acre and a postconstruction value of $4,400, indicating lost appreciation of some $3,300 per acre (a total of approximately $1,815,000 for the 550-acre parcel).

the court noted that evidence of plaintiffs' subsequent profit, earned after they were able to open their store, was insufficient proof of what their lost profits would have been had defendant not breached the contract. The court did not establish a per se rule of nonrecovery of lost profits; the court merely stated that, as an evidentiary matter, a new business would almost never be able to establish sufficient proof to recover lost profits. New York has thus been characterized as having a per se rule of nonrecoverability of lost profits to a new business (*Manniello v Dea,* 92 AD2d 426 429; Dunn, Recovery of Damages for Lost Profits § 4.1 [2d ed 1981]; *see also,* 36 NY Jur 2d, Damages, § 110 [noting that profits earned after the breach are considered too remote to be admissible and that this evidentiary rule precludes recovery for lost profits to a new business]; and *see, Miller v Lasdon,* 78 AD2d 628 [concurring opinion noting that the court could almost take judicial notice that there is no way to establish satisfactorily that an untried business will be profitable and in a given amount]).

In juxtaposition to the New York State cases, there are several Federal cases in New York permitting new businesses to recover lost profits. The key case was *Perma Research & Dev. Co. v Singer Co.* (402 F Supp 881, *affd* 542 F2d 111, *cert denied* 429 US 987). In *Perma Research,* the court cited *Cramer v Grand Rapids Show Case Co. (supra)* for the proposition that lost profits in a new venture are not ordinarily recoverable, but then went on to hold that lost profits may be awarded if plaintiff establishes three elements: that the lost profits are the direct and proximate result of the breach; that profits were contemplated by the parties; and that there is a rational basis on which to calculate the lost profits (*Perma Research & Dev. Co. v Singer Co., supra,* p 893). The first two criteria reflect the lost profits test applicable to establish businesses as enunciated in *Witherbee v Meyer* (155 NY 446, 449-450, *supra*). What the court did in *Perma Research,* in essence, was to add a third requirement for new businesses by requiring them to establish some rational basis on which to calculate the lost profits. By so holding, the court converted the *Cramer* rule of nonrecoverability into a rule of evidence. This is precisely the observation made by the author of the lost profits treatise (Dunn, *id.,* § 4.2 [observing that the original rule precluding all recovery of lost profits to new businesses has given way to rule of evidence permitting such profits if an adequate measure can be found]). The *Perma Research* test has been subsequently employed in the Second Circuit (*Lexington Prods. v B. D. Communications,* 677 F2d 251, 253; *Western*

*Geophysical Co. v Bolt Assoc.,* 584 F2d 1164, 1172, *supra; Contemporary Mission v Famous Music Corp.,* 557 F2d 918, 926, *supra; see also, For Children v Graphics Intl.,* 352 F Supp 1280, 1284 [upon which the *Perma Research* case relied]).

■ Although the issue was not directly raised, we gave tacit approval to the rule as enunciated by the Federal courts in our recent decision in *Whitmier & Ferris Co. v Buffalo Structural Steel Corp.* (104 AD2d 277). The plaintiff in *Whitmier* was not a new business, but a tenant not yet in possession. Nevertheless, the rationale for precluding recovery to tenants not in possession was the same justification for denying recovery to new businesses — lack of any certain basis for measuring lost profits (*see, Whitmier & Ferris Co. v Buffalo Structural Steel Corp., supra,* p 284 [Moule, J., dissenting]). The majority agreed with the view expressed in the dissent that a per se rule of nonrecoverability should give way to a rule of evidence permitting recovery of lost profits if there is some rational basis on which to calculate such an award. In accordance with our view expressed in *Whitmier & Ferris Co.,* we now hold that there is no per se rule precluding a new business from recovering lost profits and we adopt the test employed by the Second Circuit Court of Appeals in *Perma Research & Dev. Co. v Singer Co. (supra).*

### B. Application of the Perma Test

The first two *Perma Research* criteria are easily met. The county's failure to build the stadium was clearly the proximate cause of any loss of profits stemming from the management contract and it is unquestionable that profits by DSI from the management contract were contemplated by the parties. We conclude, however, that plaintiff has failed to establish a rational basis upon which lost profits may be calculated.[8]

Profit, of course, involves two variables — income less expenses. The management contract provided that DSI would receive 11% of gross revenues from major events (i.e., professional baseball and football) and 89% of gross revenues on "open time" events. The contract further provided that DSI would do the negotiating for all contracts, but that major event contracts would be between the performer and the county while open time events would be between the performer and DSI. To establish its lost profits, plaintiff called an expert who prepared a series of projections based on the experience of other domed facilities as

---

**8.** Although we have already resolved plaintiff's claims with respect to theme parks and the like, we note that lost profits from those ventures would not be recoverable even had they been within the parties' contemplation, due to the absence of any rational basis for calculating the loss.

well as an analysis of the market in the Buffalo area. The expert opined that the facility would hold 10 professional football games a year, as well as 42 open time events including three consumer shows, six high school football games, five circuses and seven musical or entertainment events. The expert then developed an average ticket price per event, which was multiplied by his estimate of anticipated attendance. The expert also developed an approximation of what each person would spend on parking and concessions. These figures were then computed to arrive at an anticipated revenue stream. The expert also gave his opinion of what the expenses of running the operation would be. He used a flat figure for salaries and then estimated that other expenses, such as advertising and legal fees, would be a percentage of gross revenue. His projected expenses were then subtracted from his projected revenue to arrive at a before-tax net income figure. One sheet summarizing the foregoing information was prepared for each of the 20 years of the management contract. The expert's opinion of net profit for each year ranged from just under $1,000,000 for the first year to over $4,000,000 in the 20th year. Based upon these projections of net income, the jury found lost profits totaling over $28,000,000, which the court reduced to $25.6 million after applying a formula to arrive at present value.

The issue is whether the figures supplied by the expert are sufficient, as a matter of law, upon which to base an award of lost profits. Once again, we find a decided split between the New York State cases and the Federal cases. Several Federal cases have permitted statistical analyses to support an award of lost profits to a new business. Significantly, however, all of those cases involved only a royalty payment or the sale of a single product.[9] The common thread running through those cases is

**9.** *See, Lexington Prods. v B.D. Communications* (677 F2d 251 [plaintiff granted defendant an exclusive license to sell its dusting brush in return for royalties and defendant was obligated to spend a certain sum in TV advertising; defendant failed to spend the required sums and plaintiff was permitted to offer proof that, had the required sums been spent, sales of plaintiff's brushes would have increased in proportion to the amount spent]); *Contemporary Mission v Famous Music Corp.* (557 F2d 918 [plaintiff granted defendant an exclusive right to distribute plaintiff's record in return for royalties and defendant thereafter breached; the court permitted plaintiff to use a statistical analysis to estimate how many records could have been sold had defendant continued to promote the record]); *Perma Research & Dev. Co. v Singer Co.* (402 F Supp 881, *affd* 542 F2d 111 [defendant breached its agreement to use its best efforts to market plaintiff's patented device; plaintiff was permitted to use sales projections to establish how many of the devices would have been sold, but the court noted that the sales projections were prepared at the request of defendant prior to entering into the contract and thus were not prepared "with an eye to litigation"]); *For Children v Graphics Intl.* (352 F Supp 1280 [plaintiff

that only one variable was involved, i.e., how many of the product would have been sold. Thus it was certain that plaintiff would have made money and the only uncertainty was the amount. The instant case, by contrast, is filled with conjecture. The expert had to estimate, first, how many, if any, events would be held at the stadium; how many people would attend each event; and how much each person would spend on parking and concessions. Additionally, and even more compelling, the expert also had to estimate all expense items. Highly significant in our view is that the expert assumed that various expenses would be a percentage of gross revenue, such as advertising. In short, the expert was assuming the fact to be proved, to wit, that revenues would exceed expenses. It is not inconceivable that DSI could have ended up spending more promoting events than it took in as receipts (*Broadway Photoplay Co. v World Film Corp.*, 225 NY 104, 107-108, *supra; Bernstein v Meech*, 130 NY 354; *Moss v Tompkins*, 69 Hun 288, *affd* 144 NY 659).

The cases from New York State courts are even more restrictive than the Federal cases, since they have precluded projections even in the context of a royalty case (*see, e.g., Freund v Washington Sq. Press*, 34 NY2d 379 [royalties on a book are too speculative]; *Spitz v Lesser*, 302 NY 490, *supra* [loss of royalties is limited to the minimum amount stated in the contract]; *see also, Wakeman v Wheeler & Wilson Mfg. Co.*, 101 NY 205, *supra* [opinion testimony as to how many sewing machines could have been sold is inadmissible]). Moreover, not only have the New York State cases excluded evidence of projections to justify lost profits, but New York cases have even excluded proof of plaintiff's own subsequent profits (*Cramer v Grand Rapids Show Case Co., supra*).[10] Although we agree with the view expressed

permitted to project that 75% of its books would have been sold]). The projections permitted in Federal cases involving established business similarly involved a royalty arrangement (*Bloor v Falstaff Brewing Corp.*, 454 F Supp 258, *affd* 601 F2d 609); an exclusive distributorship (*Autowest v Peugeot*, 434 F2d 556); or the lost profit on an old business less the investment return derived from the sale of the business (*Lee v Seagram & Sons*, 552 F2d 447). None of these cases permit a plaintiff to project both revenues and expenses of an unestablished business.

10. The treatise on lost profits suggests several ways in which a plaintiff might establish lost profits. These methods include: plaintiff's prior experience; plaintiff's subsequent experience; plaintiff's experience at other locations; the comparable experience of others; defendant's subsequent profits; and industry averages (Dunn, Recovery of Damages for Lost Profits §§ 5.5-5.10 [2d ed 1981]). Not all methods would be available in all cases. In the instant case, the dome was never built, and the plaintiff did not before or after engage in the management business. Nor is this type of contract narrow enough to permit of an industry average. Plaintiff's only recourse, therefore, is to rely on the comparable experience of others. Unfortunately, this method is not partic-

in a recent law review article that lost profits are too often denied because of "an arbitrary disregard of possibly relevant evidence other than a history of past profits" (Comment, *Remedies — Lost Profits as Contract Damages for an Unestablished Business: The New Business Rule Becomes Outdated,* 56 NC L Rev 693, 695 [1978]), and while we recognize the increasing acceptance of expert opinion in statistical projections (*see, e.g., Espana v United States,* 616 F2d 41, 44 [mortality tables]; *De Long v County of Erie,* 89 AD2d 376, *affd* 60 NY2d 296 [expert opinion of a homemaker's services]), the projections used in the instant case simply involve too many variables to permit them to support an award of lost profits. Although a breaching party bears the risk of any uncertainty as to the amount of damage (*Plant Planners v Pollock,* 60 NY2d 779; *Spitz v Lesser, supra,* p 494), plaintiff must first establish that he has, in fact, suffered lost profits (*see, Wade Lupe Constr. Co. v B & J Roofing Co.,* 84 AD2d 615, *affd* 55 NY2d 993; *Robert Brian Assoc. v Loews Theatres,* 71 AD2d 584 [no proof that profit would have been made]; *cf. Brady v Erlanger,* 188 App Div 728 [history of past profits sufficient to project future lost profits]). We find plaintiff's projections insufficient as a matter of law to support an award of lost profits.[11]

ularly reliable under the facts herein because of the wide divergence of variables between stadium facilities in different cities. We agree with the view expressed by the Seventh Circuit approving of the comparable business approach (also known as the yardstick measure), but noting that " 'the business used as a standard must be as nearly identical to the plaintiffs as possible' " (*Cates v Morgan Portable Bldg. Corp.,* 591 F2d 17, 22, n 7, quoting *Lehrman v Gulf Oil,* 500 F2d 659, 667).

11. We have considered the cases cited to us from other jurisdictions but find that, even under the holdings of those cases, the instant award of lost profits could not be sustained (*see, Kreedman & Co. v Meyers Bros. Parking-Western Corp.,* 58 Cal App 3d 173, 130 Cal Rptr 41 [parking garage operator was permitted lost profits after developer failed to construct garage, but court noted that lessee was experienced in the business and the operation of a parking garage is a relatively simple operation with sufficiently few decisions to make the prediction of profits reasonably possible]; *Smith Dev. Corp. v Bilow Enters.,* 112 RI 203, 308 A2d 477 [allowing a McDonald's restaurant lost profits based on the experience of other McDonald's restaurants in the area; the court noted the high degree of similarity among restaurants in this franchise]; *see also, Riley v General Mills,* 226 F Supp 780 [permitting recovery of loss of commissions on insurance policies]; *Sandler v Lawn-A-Mat Chem. & Equip. Corp.,* 141 NJ Super 437, 358 A2d 805 [breach of a distributorship agreement]). Of these cases, only two involved projections of expenses, and in these cases (involving the McDonald's restaurant and the parking garage) there was a high degree of similarity between the business not constructed and the business from which data was derived.

The instant case is more analogous to those cases denying recovery to a new business (*China Doll Rest. v Schweiger,* 119 Ariz 315, 580 P2d 776 [a restaurant]; *Evergreen Amusement Corp. v Milstead,* 206 Md 610, 112 A2d 901 [drive-in theater]; *Albin Elevator Co. v Pavlica,* 649 P2d 187 [Wyo] [wheat farm]).

IV. OUT-OF-POCKET EXPENSES

█Lastly, defendant seeks reversal of the $6,000,000 awarded Kenford as reliance and mitigation damages. It is well settled, of course, that a party may not recover both the expense of performing his side of the contract and the profit to be received under it, since "an award of lost profits * * * will make plaintiff whole" (*R & I Elec. v Neuman,* 66 AD2d 836, 837; *see also, Schultz & Son v Nelson,* 256 NY 473; *Oswego Falls Pulp & Paper Co. v Stecher Lithographic Co.,* 215 NY 98; *Borden v Chesterfield Farms,* 27 AD2d 165). By contrast, a party may recover mitigation expenses in addition to lost profit, because mitigation expenses would not have been incurred had defendant not breached the contract, and hence there is no double recovery. We view all damages awarded after the date of breach (Aug. 8, 1970) as mitigation damages properly submitted to the jury, and accordingly we affirm the jury's finding of mitigation damages of $6,160,030.46. The jury's finding of expenses prior to that date ($6,218.17 and $636,502.34), however, is reversed, and the matter remitted for a new trial. Upon retrial, plaintiff's proof should not include any sums expended for land acquisition expenses (i.e., brokerage commissions, recording fees, etc.), or for interest paid on the mortgages, since these sums would have been paid even without the breach and since plaintiff will be compensated for these sums by being awarded loss of appreciation of land value. Only expenses incurred as preparatory to the aborted management agreement, for which no lost profits are recoverable, may be awarded.

Accordingly, the judgment should be modified and the matter remitted for further proceedings in accordance with this opinion.[12]

HANCOCK, JR., J. P. (concurring in part and dissenting in part). The appeal, as we see it, turns on this overriding question: whether the County of Erie, in addition to repaying plaintiffs for mitigation damages and for their out-of-pocket losses incurred in reliance on the county's promise to build the dome, should also pay a sum equal to the financial benefits plaintiffs would supposedly have achieved if the dome had been built and had proved to be a success.

The case may be simply stated. Believing that the domed stadium would be an economic boon and would result in increased property taxes, the county agreed to the plan advanced

---

**12.** We feel compelled to note that the court is unanimous in its determination of all major issues raised on this appeal, save one — the recoverability of Kenford's lost appreciation in land value.

on behalf of plaintiffs under which the county would construct the domed stadium on land conveyed to it by plaintiff Kenford. About a year later, when it learned that it would cost far more to build the dome than had been expected, the county decided that it could not afford to proceed with construction. Eventually it reconveyed the land to Kenford. Plaintiffs' determined efforts to make other arrangements for carrying the project forward proved unsuccessful. The dome was never constructed and neither plaintiffs nor the county have received any of the rewards which they had hoped to realize from the operation of the dome and its beneficial effect on the surrounding land.

Plaintiffs have recovered judgments totaling approximately $62,000,000 of which by far the greatest share represents plaintiffs' loss of expectancies: i.e., the profits expected to be made by plaintiff Dome Stadium, Inc. (DSI), from its management of the stadium and the anticipated enhancement in the value of Kenford's land surrounding the dome on which it had planned to develop a theme park, a golf course and other accessory facilities.

The majority have concluded that the proof submitted in support of the DSI's claim for loss of profits was inadequate and for that reason have reversed and dismissed that claim. We agree with this result. They have also found that the damages awarded for Kenford's "loss of appreciation in peripheral land values" were "too speculative to permit recovery" and have reversed that part of the judgment as well and, again, we concur. The majority would, however, permit Kenford to establish its land appreciation claim by "appraisal testimony indicating what the land would have been worth as raw acreage immediately following construction of the stadium."

In our opinion, for reasons set forth in Part I, *infra*, plaintiffs, under the circumstances here, may not, as a matter of law — and irrespective of the speculative nature of the proof — recover *any part* of their claimed expectancy losses including the land appreciation claim. For this reason alone, there should be no retrial on that issue. Additionally, aside from the legal objections to any expectancy recovery discussed in Part I, we are of the view, as explained in Part II, *infra*, that whatever proof plaintiffs may offer in support of their land appreciation claim on a retrial would necessarily be too speculative to constitute a valid legal basis for the claim. Thus, we differ with the majority on two points: (1) whether, regardless of the proof offered, there can be a recovery for any expectancy losses, and (2) assuming, arguendo, that there can be such a recovery, whether the proof

on the loss of expected land appreciation would, in any event, be too speculative.

We must, therefore, dissent from so much of the judgment as grants a new trial on this issue. We agree that the judgment for the recovery of mitigation damages should be affirmed but would grant a new trial to permit plaintiff Kenford to recover whatever additional reliance damages it may establish including the cost of acquiring the properties it assembled for the dome development.

## I

The rule in *Hadley v Baxendale* (156 Eng Rep 145, 151), as it has been refined in the courts, provides that damages are considered to be foreseeable and hence chargeable to defendant when the loss is foreseeable in the ordinary course of events as the probable result of the breach or when, although not the probable result of the breach in the ordinary course of events, the damages result from special circumstances which defendant had reason to know (*see,* statement of the rule in *Czarnikow-Rionda Co. v Federal Sugar Refining Co.,* 255 NY 33, 41, and in Restatement [Second] of Contracts § 351 [1], [2] [1979]). In applying the general *Hadley v Baxendale* foreseeability test to the expectancy damages claimed here, it is not enough to ask whether the defendant, when it agreed to the contract, could reasonably have foreseen that plaintiffs' hoped-for benefits from the dome's construction would not be realized if the dome were not built. The obvious fact that without the dome there would be no benefits for anyone was known to all. What must have been reasonably foreseeable is that if the county did not build the dome, it would not be built at all; for it is clear that the dome's ultimate nonexistence results as much from plaintiffs' inability to arrange other means of funding the project as from defendant's decision not to go ahead with it. The proper question then is whether the county should have foreseen that plaintiffs would be unsuccessful in making other arrangements and would eventually look to the county as the sole means for making their hopes a reality (*see, Czarnikow-Rionda Co. v Federal Sugar Refining Co., supra; Kerr S. S. Co. v Radio Corp.,* 245 NY 284). The record supports the conclusion, applying the general *Hadley v Baxendale* rule, that it was not reasonably foreseeable that plaintiffs would ultimately fail and would look to the county as their sole source of available financing. There is no evidence that plaintiffs discussed the point with the county and, indeed, no claim that this special circumstance was ever brought to the

county's attention.[1] And plaintiffs' persistent and prolonged attempts to find other sources of private and public financing after the county decided not to proceed must be taken as proof that they certainly did not believe that the county was the only possibility.[2]

It is not the general *Hadley v Baxendale* foreseeability rule (*see,* Restatement [Second] of Contracts § 351 [1], [2] [1979]), however, which affords the county its chief legal basis for objecting to plaintiffs' expectancy claims — but rather a refinement of the general rule which has evolved from the efforts of courts to find a workable way of limiting recoveries of expectancy claims when they result in unfairly disproportionate damages.[3] Under this special application of the general rule we conclude that the expectancy losses here should be disallowed for reasons of justice as excessive and disproportionate damages (*see,* Restatement [Second] of Contracts § 351 [3] [1979]) or as damages resulting from an unfair allocation of the risks which defendant could not have contemplated (*see, e.g., Rochester Lantern Co. v Stiles & Parker Press Co.*, 135 NY 209, 217-218; *Whitmier & Ferris Co. v Buffalo Structural Steel Corp.*, 104 AD2d 277, 279).

Before discussing these objections, we observe that there is no reason to treat the claim of DSI for loss of profits differently from those of Kenford for loss of enhancement in land value or for loss of its profits from the theme park, the golf course and other planned enterprises. The considerations which apply to all parts

**1.** Compare *Czarnikow-Rionda Co. v Federal Sugar Refining Co.* (255 NY 33), *Kerr S. S. Co. v Radio Corp.* (245 NY 284) and *Hadley v Baxendale* (156 Eng Rep 145) where the special circumstances (i.e., plaintiff's inability to purchase sugar in the open market in *Czarnikow,* the important commercial nature of the transaction referred to in the radiogram in *Kerr S. S. Co.,* and that the flour mill's continued operation was dependent upon prompt delivery of the broken shaft in *Hadley v Baxendale*) were not known to the defendants.

**2.** Plaintiffs' "mitigation damages" are based on their efforts to secure alternate funding for the dome after the county decided not to go forward. It must be assumed that these efforts were undertaken in good faith and that plaintiffs thought that they had at least a reasonable chance of success. Otherwise, such damages should be disallowed.

One must also assume that if the county officials had been advised in August of 1969 that the county was then considered to be the only potential funding source for the project and that it might in the future be held accountable as such, the county would never have agreed to the contract without a clause excluding claims for loss of profits and consequential damages.

**3.** *See generally,* Harvey, *Discretionary Justice Under the Restatement (Second) of Contracts,* 67 Cornell L Rev 666, 676-679 (1982); Comment, *Lost Profits as Contract Damages: Problems of Proof and Limitations on Recovery,* 65 Yale LJ 992, 1020-1026 (1956); Fuller & Perdue, *The Reliance Interest in Contract Damages: 1,* 46 Yale LJ 52, 84-88 (1936); Fuller & Perdue, *The Reliance Interest in Contract Damages: 2,* 46 Yale LJ 373, 374-376 (1936).

of plaintiffs' expectancy losses are the same. The problem is one of viewing the situation at the time the contract was made and ascertaining whether, in the light of all the circumstances, the allocation of the risks upon which plaintiffs' expectancy claims must depend is a fair one, or one that is unfair and productive of disproportionate damages which defendant could not have contemplated. It would be illogical to approach the question with hindsight in the light of what a jury may have done 14 years later or by fragmenting the claim and treating it piecemeal. The *Hadley v Baxendale* rule relates to considerations at the time the contract was made and, accordingly, we shall consider all claims for loss of expectancies as one.

Under plaintiffs' theory, they should be compensated in damages, in addition to their out-of-pocket expenses, with an award that equals all the benefits they could conceivably have realized, assuming not only that the dome had been constructed but also that the dome achieved the hoped-for profits as an operating facility and produced the anticipated beneficial effect on the surrounding land. This claim that plaintiffs should have as damages for defendant's breach the monetary equivalent of defendant's full performance is made despite the fact that the county has received nothing at all of benefit from the undertaking.

Put simply, plaintiffs' version of what was contemplated comes to this. The county not only promised to build the dome but to back up its promise with what amounts to a guarantee that if for any reason it could not build it, plaintiffs would receive whatever benefits the dome could have produced. Plaintiffs were to win with or without the dome and to win more without it than with it because they would then not have to perform their contracts and there would be no risks of the operation's failure. On the other hand, the county, if, for example the construction bids proved to be too high, would have to choose the lesser of two evils: either build a stadium that it did not want because it was too costly or not build it and pay for plaintiffs' huge expectancy losses on the "guarantee". In blunt terms, it was "heads or tails" plaintiffs win. It is inconceivable that such an unfair and disproportionate allocation of the risks could have been contemplated by the county as part of the bargain, and it would be highly unjust to impose the result of the allocation as a foreseeable consequence of the breach.

Courts have devised various solutions to the problem of loss of expectancy claims which result in damages that are disproportionate and unfair. The "tacit agreement" test of *Globe Refining*

*Co. v Landa Cotton Oil Co.* (190 US 540), a requirement that a loss must be not only foreseeable but also one for which the promisor, at least tacitly, had agreed to be responsible, was once the accepted limit on recoverable damages. Although now largely out of favor and rejected in the Restatement (Second) of Contracts (*see,* § 351, Reporter's Note, comment a), the "tacit agreement" rule is still sometimes applied (*see, Keystone Diesel Engine Co. v Irwin,* 411 Pa 222, 191 A2d 376; *but see, R.I. Lampus Co. v Neville Cement Prods. Corp.,* 474 Pa 199, 378 A2d 288; *and see, Hooks Smelting Co. v Planters' Compress Co.,* 72 Ark 275, 285-287, 79 SW 1052, 1055-1056; *Flug v Craft Mfg. Co.,* 3 Ill App 2d 56, 120 NE2d 666; *Thurner Heat Treating Co. v Memco, Inc.,* 252 Wis 16, 30 NW2d 228; *see generally,* Dunn, Recovery of Damages for Lost Profits § 1.15 E [2d ed 1981]). The approach taken by the American Law Institute in the Restatement (Second) of Contracts is that the "court may limit damages for foreseeable loss by excluding recovery for loss of profits, by allowing recovery only for loss incurred in reliance, or otherwise if it concludes that *in the circumstances justice so requires in order to avoid disproportionate compensation*" (Restatement [Second] of Contracts § 351 [3] [1979]; emphasis added; *see,* Harvey, *Discretionary Justice under the Restatement [Second] of Contracts,* 67 Cornell L Rev 666, 677-679 [1982]).[4]

Whether it is under the "tacit agreement" test (*Globe Refining Co. v Landa Cotton Oil Co., supra*), or by ruling out the disproportionate loss in the interest of justice (Restatement [Second] of Contracts § 351 [3] [1979]) or as "excessive" and "harsh" (*see, Sullivan v O'Connor,* 363 Mass 579, 296 NE2d 183) or by simply holding that the damages are so disproportionate that they could not have been contemplated (*see, Whitmier & Ferris Co. v Buffalo Structural Steel Corp.,* 104 AD2d 277, *supra; Cayuga Harvester v Allis-Chalmers Corp.,* 95 AD2d 5, 14), the courts have found ways to exclude such losses. Thus, we recently held that under *Hadley v Baxendale* the parties could not reasonably have contemplated that for the breach of a first refusal option for

---

4. For a discussion of a proposal made by former Chief Judge Charles D. Breitel as an alternative to the "tacit agreement" test of *Globe Refining Co. v Landa Cotton Oil Co.* (190 US 540) and to the justice standard postulated in Restatement (Second) of Contracts (§ 351 [3]), *see,* Harvey, *Discretionary Justice Under the Restatement (Second) of Contracts* (67 Cornell L Rev 666, 677, n 44 [1982]). Judge Breitel's proposal was as follows: "A court may limit damages for foreseeable loss by excluding recovery for loss of profits by allowing recovery only for loss incurred in reliance or otherwise if it concludes that the arrangement * * * in the particular circumstances was not intended to embrace a disproportionate extended liability" (56th Ann Meeting of Am Law Inst, Proceedings, at 342-343 [1979]).

additional billboards in a lease for advertising space (providing an annual rental to defendant in the amount of $600 per year) defendant would be held responsible for loss of profits in the amount of $227,000 based on what plaintiff would have earned from the billboards in its advertising business if it had been permitted to exercise the option (*see, Whitmier & Ferris Co. v Buffalo Structural Steel Corp., supra,* p 279). And in *Cayuga Harvester v Allis-Chalmers Corp.* (95 AD2d 5, *supra*), we rejected plaintiff's contention as an unreasonable allocation of the risks that defendant's failure to repair and replace defective parts in a harvesting machine should "despite its good-faith efforts to fulfill its obligations, subject it to a lawsuit for consequential damages and loss of profits which, in view of the size of plaintiff's operation, could result in a recovery many times the value of the N-7 combine" (*Cayuga Harvester v Allis-Chalmers Corp., supra,* p 14).

Moreover, in cases not involving expectancy losses but claims for reliance damages only, the courts in applying *Hadley v Baxendale* have yielded to the "impulse to preserve some proportion between liability imposed on the defendant and the compensation which was paid to him under the contract" (Fuller & Perdue, *The Reliance Interest in Contract Damages: 1,* 46 Yale LJ 52, 88 [1936]).[5] For example, in *Rochester Lantern Co. v Stiles & Parker Press Co.* (135 NY 209, *supra*), the court rejected plaintiff's claims for expenditures for room rent, for rental of business premises and for salaries paid to employees all wasted by defendant's failure to supply steel dies. In holding under the

---

**5.** In his authoritative article on reliance interests, Professor Fuller (citing New York decisions) comments: "The fact that the maximum benefits derivable from the contract by the defendant were very small in comparison with the liability sought to be imposed on him was expressly made a basis for denying the relief asked in Rochester Lantern Co. v Stiles & Parker Press Co., 135 N.Y. 209, 31 N.E. 1018 (1892), and was no doubt an important if latent factor in Price v Eisen, 31 Misc. Rep. 457, 64 N.Y. Supp. 405 (App. Term 1900), and Koneman v Seymour, 176 Ill. App. 629 (1913)" (Fuller & Perdue, *The Reliance Interest in Contract Damages: 1,* 46 Yale LJ 52, 88, n 58 [1936]; *see generally,* references cited *supra,* n 3).

Courts in other jurisdictions have made express references to the disproportion between the liability sought to be imposed on defendant and the benefits received. For example, in *Thurner Heat Treating Co. v Memco* (252 Wis 16, 30 NW2d 228), the court in rejecting the claim for loss of profit where the plaintiff sought $2,337 for a job which earned the defendant $149.50 stated "while this discrepancy in itself does not justify a holding that $2,337 would necessarily be excessive damages, it is some evidence that the respondents would not have agreed to do the work if such damages were contemplated" (*see also, Hooks Smelting Co. v Planters' Compress Co.,* 72 Ark 275, 285-287, 79 SW 1052, 1055-1056; *Flug v Craft Mfg. Co.,* 3 Ill App 2d 56, 120 NE2d 666; *Sullivan v O'Connor,* 363 Mass 579, 584-586, 296 NE2d 183, 187-188).

*Hadley v Baxendale* rule that such losses "could not have been contemplated", it commented (135 NY, at p 218): "If we should adopt the rule of damages contended for by the plaintiff, what would be the limits of its application? Suppose instead of employing two men the plaintiff had projected an extensive business in which the dies were to be used, and had employed one hundred men * * * and had kept the men and the building unemployed for months and, perhaps, years, could the whole expense of the men and building be visited on the defendant as a consequence of its breach of contract? If it could we should have a rule of damages which might cause ruin to parties unable from unforeseen events to perform their contracts."

Factors other than the illogic of the notion that the county could have agreed to bear such an unfair allocation of the risks compel the conclusion that the possibility of paying for plaintiffs' expectancy losses could not have been in the county's contemplation at the time it made the contract. For one thing, the remarkably informal and almost casual nature of the dealings between the parties and of the contract documents (*see particularly,* Exhibit 82-A, the county's contract with Kenford and *see infra,* n 7) indicates that little, if any, thought could have been given to what risks the county was undertaking.[6] We must assume that the county, if there had been the slightest hint of the allocation of risks which plaintiffs now seek to impose, would either never have signed the Kenford contract or would, through its attorneys, have insisted on a contract appropriate for a governmental entity with proper clauses excluding claims for consequential damages and loss of profits.[7] And the nature of

---

**6.** In Restatement (Second) of Contracts § 351 comment f, at 141 (1979), pertaining to various factors that should be considered in excluding disproportionate damages under the justice standard, the reporter states: "Another such circumstance is an informality of dealing, including the absence of a detailed written contract, which indicates that there was no careful attempt to allocate all of the risks. The fact that the parties did not attempt to delineate with precision all of the risks justifies a court in attempting to allocate them fairly."

**7.** The county's agreement with Kenford for the construction of the multimillion dollar domed stadium is in a five-page agreement (Exhibit 82-A) consisting of six paragraphs, almost all of which concern the terms of a lease agreement to be agreed upon in the future. The single clause pertaining to the county's undertaking to construct the domed stadium is as follows: "The County shall construct domed facilities comparable to the Houston Astrodome on the stadium site area, and shall construct access roadways as generally depicted on the attached map, Schedule B. Such construction of the domed stadium facilities shall be commenced by the County within twelve (12) months after execution of this Agreement." There are no limits on costs or other safeguards. The promise is unconditional and absolute. For purposes of contrast only, compare the "Termination for Convenience of the Government" clause in the United States Government construction contract which (in 1 of 11

the contract must be considered — that, from the standpoint of the officials who dealt with the proposal's sponsors, it was not a commercial contract at all[8] but one to be made in the public interest on behalf of a municipal government.

This is not a case like *Contemporary Mission v Famous Music Corp.* (557 F2d 918), where plaintiff was deprived of profits from the sale of its recordings because it relied on the promise of defendant to promote and market the recordings and lost the opportunity to market them through other channels. Here, plaintiffs do not claim to have lost other available means for constructing the dome because of their dealings with the county. As it turned out, there apparently never were other available means.

Nor is it like *Wakeman v Wheeler & Wilson Mfg. Co.* (101 NY 205) where the plaintiffs had performed their part of the bargain in selling specified quantities of sewing machines in Mexico and defendant had reaped a benefit from these efforts. Here, the plaintiffs and the county both hoped to benefit if the county went forward and built the dome. When the county decided it could not do that, the contracts were of no value to it and it received no benefit whatsoever.

As pointed out, the justice standard formulated in Restatement (Second) of Contracts § 351 (3) (1979) is not the only test a court may apply to avoid unfair allocation of the risks and disproportionate damages. We find it difficult, however, to conceive of a better guideline than the dictates of justice or one that is more germane to the case at bar or, for that matter, to our recent decision in *Whitmier & Ferris Co. v Buffalo Structural Steel Corp.* (104 AD2d 277, *supra*). In applying the section 351 (3) justice standard, it makes no difference whether we compare

paragraphs contained in that clause in the standard contract covering 103 pages in the form book [11 McBride and Touhey, Government Contract Cyclopedic Guide to Law, Administration, Procedure, at 1-75 — 1-178]) reads as follows: "(a) The performance of work under this contract may be terminated by the Government in accordance with this clause in whole, or from time to time in part, whenever the Contracting Officer shall determine that such termination is in the best interest of the Government. Any such termination shall be effected by delivery to the Contractor of a Notice of Termination specifying the extent to which performance of work under the contract is terminated, and the date upon which such termination becomes effective" (11 McBride and Touhey, Government Contracts Cyclopedic Guide to Law, Administration, Procedure, Standard Form 23-A, Termination for Convenience of the Government, at 1-128 [rev ed 1984]).

8. Restatement (Second) of Contracts § 351 comment f, at 141-142 (1979) states: "The limitations dealt with in this Section [on the recovery of disproportionate damages] are more likely to be imposed in connection with contracts that do not arise in a commercial setting."

what plaintiffs would receive (if permitted to recover for the full extent of their expectancies) with what defendant has actually received (no benefit at all since the dome was not built) or, as the majority contend we should (see supra, majority opn, n 5), with what defendant supposedly would have received from its own performance, assuming there had been no breach. For, very simply, the county has determined that the potential benefits to be derived from performance were outweighed by the cost of obtaining those benefits.[9] The result of going forward with the dome project, the county has found, would be a detriment, not a benefit — a net loss, not a gain. But even without considering the prohibitive cost, it seems apparent that in any application of the section 351 (3) justice standard plaintiffs' recovery for their full expectancies[10] would outweigh the value of whatever benefits defendant might have received from performance. The expected tax revenues from increased assessments cannot reasonably be counted in the equation as a benefit to the county since they are not part of the consideration flowing from plaintiffs and would, in any event, be only what the owners of the peripheral land would have to pay in taxes for the additional municipal services required by their completed improvements. It seems equally inappropriate to count as a benefit to the county the dubious expectancy of profits to be derived from the dome operation both because such profits are at best conjectural and uncertain (see, majority opn, Point III, supra) and because the profits, if any, would be nothing more than what the county would be entitled to earn as a return on its own multimillion dollar investment and for the millions of dollars it would be obligated to pay in interest on the bond issue. Thus, whether or not defendant's completed performance is assumed for the purpose of the analysis under the section 351 (3) justice standard, permitting the recovery of plaintiffs' expectancy losses presupposes a decidedly unfair allocation of the risks and results in disproportionate damages.

In sum, it would be unjust to compensate plaintiffs with an award of damages which would put them in the same position they would have been in if the dome had been built. It is one thing to keep plaintiffs from being made worse off than they

9. The bond resolution passed in 1968 was for $50,000,000. The bids for the stadium came in at $70,000,000. In addition, the county was obligated "to acquire the remaining portion of the stadium site area" (Resolution, Erie County Legislature, June 18, 1969).

10. The total of plaintiffs' proof on trial for loss of expectancy damages was approximately $315,000,000. The total of the demands in plaintiffs' complaints was $495,000,000.

were before their reliance on the contract and before defendant's breach; it is quite another to put them in a far better position and to do it at vast expense to defendant. Therefore, under the rules discussed above, Kenford's claim for loss of enhanced land value as well as the claims of DSI and Kenford for lost profits should be rejected: either as damages that could not have been within defendant's contemplation under *Hadley v Baxendale* (*see, Whitmier & Ferris Co. v Buffalo Structural Steel Corp.,* 104 AD2d 277, *supra*) or in the interest of justice "in order to avoid disproportionate compensation" (Restatement [Second] of Contracts § 351 [3] [1979], *see,* comment f).

## II

The additional question presented by plaintiffs' claim for loss in enhancement of value in its peripheral lands is whether, considering the extraordinary nature of the Kenford domed stadium proposal, such claimed damages can ever be anything but too speculative to permit recovery. No case has been cited where a plaintiff in a suit for defendant's failure to build a promised improvement has recovered damages based on what his adjoining land would have been worth if the defendant had performed. We have found no helpful precedent. Arguably, such damages are always too speculative since the values on which they are based must necessarily depend on hypothesizing a construction which did not take place and its consequent effect on market values. This could be so even in cases involving shopping centers or other commercial enterprises where comparable sales might be available to give some basis for an opinion as to the value impact the hypothesized development might have had on the property. Thus, in any case of this kind, unlike appropriation and condemnation cases, where the experts' opinions are of what the property was actually worth in the market at the time of taking, the opinions (because they depend on the assumption of circumstances which never existed) are, perforce, always of theoretical, and never actual value. For this reason, we fail to see why the rationale behind the general judicial resistance to claims for loss of profits in cases involving untried businesses (*see,* majority opn, Parts I and III, *supra; and see, Cramer v Grand Rapids Show Case Co.,* 223 NY 63; *Manniello v Dea,* 92 AD2d 426, 429; *Miller v Lasdon,* 78 AD2d 628) should not apply equally to a loss of claimed profit to land from an improvement which never existed.[11] For both must depend on

---

11. See Fuller & Perdue, *The Reliance Interest in Contract Damages: 2,* 46 Yale LJ 373, 374-377 (1936). The authors note (at 373-374): "The objection that damages measured by the expectancy are too 'conjectural' to be allowed can obviously have no application to a case where the subject matter of the contract

the assumption that the venture would be successful and, as has been noted, the "uncertainties of economic life are just too great" (*Miller v Lasdon, supra* [Silverman, J., concurring]).

But we need not address the question of whether there can ever be a recovery in a claim of this nature for loss of land value enhancement where the completion of a nonexistent improvement must be assumed, for the improvement which must be hypothesized here is a domed stadium — a stadium which, during the times in question, was to be one of two on the North American continent and a project for which the Houston Astrodome was the only model. Because of the unique nature of the proposed improvement and the absence of any comparable market data, the valuations would, in our opinion, always be hopelessly speculative — whether one hypothesizes for the purpose of the completion of the entire project or of only the dome. For unlike cases involving typical commercial developments, a market here must be manufactured by resorting to sales and market information from Houston and other distant areas or to local developments which are totally dissimilar.

It does not alleviate the problem to point out, as the majority do, that defendant, after its objections to the entire line of proof as legally speculative and therefore inadmissible were overruled, adduced some proof through its own expert as to the theoretical impact the dome's construction might have had. That the defendant, as a matter of trial tactics, felt it had to counter plaintiff Kenford's speculative proof with its own proof does not result in a waiver of its objections. It has properly preserved the issue for review (*see,* CPLR 4017, 5501; *see generally,* 1 Wigmore, Evidence § 18 D, at 836-838, 837, n 36 [1983]). And the county's efforts to rebut Kenford's expert can certainly not have had the curative effect of making admissible evidence which, *because of its very nature,* was speculative as a matter of law, and which, for that reason, should have been excluded. In sum, whether the land is valued on the assumption that the peripheral developments have been completed or, as the majority direct, "as raw acreage immediately following construction of

---

has a market value and the plaintiff seeks only the difference between the contract price and the market value. The objection can arise only (1) where the contract relates to a subject matter of uncertain value, that is, having no 'market' ".

In the case at bar we submit that the damages are speculative because of the hypothetical nature of the improvement and of the market — the exact opposite of the situation in *Contemporary Mission v Famous Music Corp.* (557 F2d 918, 927), where the court observed: "This is not a case in which the plaintiff sought to prove hypothetical profits from the sale of a hypothetical record at a hypothetical price in a hypothetical market."

the Dome," the proof, we believe, must be incurably speculative and for that reason we find a retrial on the land enhancement issue unwarranted.

For these reasons, we believe that the judgment for the recovery of mitigation damages should be affirmed and that a new trial should be granted only on the issue of Kenford's reliance damages. Plaintiffs' other claims should be dismissed and the judgment appealed from insofar as it dismisses plaintiff Kenford's claim for loss of profits on the projected improvements on the peripheral lands should be affirmed.

O'DONNELL and SCHNEPP, JJ., concur with DOERR, J.; HANCOCK, JR., J. P., and BOOMER, J., dissent in part, in an opinion by HANCOCK, JR., J. P.

Judgment modified, on the law, and as modified, affirmed, without costs, and matter remitted to Supreme Court, Erie County, for a new trial, in accordance with opinion by Doerr, J.