WHITMIER & FERRIS CO., INC., Appellant-Respondent, v BUFFALO STRUCTURAL STEEL CORP., Respondent-Appellant, and NATIONAL ADVERTISING CO., a Subsidiary of 3-M, Respondent.

Fourth Department, December 14, 1984

**APPEARANCES OF COUNSEL**

*Jaeckle, Fleischmann & Mugel (Henry W. Killeen, III,* of counsel), for appellant-respondent.

*Raichle, Banning, Weiss & Halpern (R. William Stephens* of counsel), for respondent-appellant.

*Runals, Broderick & Shoemaker (John E. Runals* and *Richard J. Hogan, Jr.,* of counsel), for respondent.

## OPINION OF THE COURT

*Per Curiam.*

Under a written agreement, defendant Buffalo Structural Steel Corp. (BSS) leased to plaintiff for a rental of $600 per year a small rectangular parcel of land for the purpose of erecting and maintaining an outdoor advertising sign. In March, 1979, defendant BSS leased two comparable parcels for outdoor advertising to defendant National Advertising Co. (National), each lease providing for rental of $1,500 per year and an eight-year term with an option to renew at the same rental for an additional eight years. In this action for damages and other relief, it has been established as law of the case in an order granting partial summary judgment to plaintiff against defendant BSS that the lease from defendant BSS to defendant National constituted a breach of the first option provision contained in the lease from defendant BSS to plaintiff. The order granting plaintiff partial summary judgment directed that the issue of damages against defendant BSS be tried. A bench trial of this issue as well as the issue of the liability of defendant National has been held. In a written decision, the court ruled that defendant National was not liable to plaintiff. With respect to plaintiff's appeal contesting defendant National's liability, we agree with the dissenter that there should be an affirmance and we adopt fully that portion of the dissenting opinion on that issue. At trial, plaintiff adduced proof in support of its contention that it was entitled to damages against BSS for the profits it would have received from the rental of outdoor advertising signs if it had been permitted to exercise the first option provision in its lease with defendant BSS and to enter into the March, 1979 leases between defendants BSS and National on the identical terms in those leases. In its decision, the court held that as a matter of law plaintiff was not entitled to recover lost profits but was limited to recovering the difference between the actual rental value of the lease and the rental reserved in the lease. Because no evidence of the actual rental value of the leases between defendants BSS and National was adduced, it awarded plaintiff nominal damages of $1 and plaintiff has appealed. The court denied plaintiff's alternative request for equitable relief. There should be an affirmance.

We agree with the view expressed in the dissent that the fact that a tenant has not taken possession of a leasehold should not, as a matter of law, preclude the tenant from recovering lost profits for breach of a lease. Nevertheless, in any action for breach of contract, including a lease, the defendant may only be

held responsible for such damages "as may reasonably be supposed to have been in the contemplation of both parties, at the time they made the contract, as the probable result of the breach of it" (*Hadley v Baxendale,* 156 Eng Rep 145, 151; see *Spang Inds. v Aetna Cas. & Sur. Co.,* 512 F2d 365; *Kerr S.S. Co. v Radio Corp. of Amer.,* 245 NY 284). On the record here we hold that at the time plaintiff and defendant BSS entered into their lease, the parties could not have reasonably contemplated that defendant BSS might be held responsible for loss of profit damages for breach of the first option clause to be computed under a suppositious lease, the terms of which could not, if ever, be known until some future time when plaintiff might negotiate a lease with a third party.

We find no merit in the cross appeal by defendant BSS. The judgment should be affirmed.

MOULE, J. (dissenting). The principal question presented on this appeal is whether a tenant, although not in possession, may recover lost profits for the breach of a lease agreement.

Plaintiff is engaged in the outdoor advertising business in western New York. It leases or purchases real property, erects billboards upon the property, and then leases the billboards to advertisers. In January, 1969, plaintiff and defendant Buffalo Structural Steel Corp. (BSS) entered into a three-year lease permitting plaintiff to erect a billboard upon BSS's property adjacent to the Scajaquada Expressway in the City of Buffalo. The lease provided that, after expiration of the three-year term, plaintiff could renew on a year-to-year basis for an additional five years. The lease was a standard form used by plaintiff and contained the following exclusivity provision: "The Landlord [BSS] represents and warrants that it is the Owner of the premises above described and has authority to make this lease and covenants that [it] will not permit any adjoining premises, owned or controlled by [it], to be used for advertising purposes or permit Tenant's signs to be obstructed." Additionally, at the request of BSS, the following language was typed in at the end of the lease: "Tenant to erect one (1) fifty foot wide and twelve foot high billboard on the ground in the area designated in red on the attached plot plan. Tenant shall have the first option to erect additional signs for advertising purposes with the consent of the Landlord which event would necessitate an additional lease upon terms to be agreed upon at such time."

After expiration of the three-year term specified in the lease, plaintiff exercised its option to renew in January of each of the succeeding years through 1976. Although the five-year period in

which plaintiff had the right to renew the lease expired in January, 1977, plaintiff continued to offer BSS an annual rent check for the leasehold from 1977 through 1980. BSS accepted plaintiff's annual checks during this period; tender and acceptance of rent was the method of renewal specified in the lease. Each rent check tendered by plaintiff specifically described the 1969 lease, referred to the rental period covered by the particular check, and contained the legend, "Endorsement of this check will be considered * * * notice of renewal of lease."

In March, 1979, after BSS had already accepted plaintiff's annual rental payment, BSS and codefendant National Advertising Co. (National) entered into two lease agreements permitting National to erect two outdoor advertising signs on BSS's property. The leases became effective on May 1, 1979 and were to continue for an initial term of eight years; the lessee was also given the option to extend the leasehold for a second term of eight years. Annual rental for each lease was $1,500.[1] The leases contained an exclusivity clause similar to the one in plaintiff's lease. There is no dispute that BSS never offered plaintiff the first opportunity to erect additional signs upon the same terms granted to National.

BSS notified plaintiff in December, 1980 that it would not renew the 1969 lease between the parties in 1981. Plaintiff thereafter instituted this action against BSS for breach of contract and against National for intentionally inducing BSS to breach its contract with plaintiff. Plaintiff seeks money damages from both defendants or, in the alternative, specific performance of BSS's obligation under both the exclusivity and first option clauses of the lease.

BSS subsequently moved to dismiss plaintiff's complaint for failure to state a cause of action and plaintiff cross-moved for partial summary judgment against BSS declaring that maintenance of National's signs was in violation of the lease and seeking an immediate assessment of plaintiff's damages.[2]

Special Term denied BSS's motion to dismiss, granted plaintiff's motion for partial summary judgment and ordered an immediate trial on damages. Special Term held that the parties had implicitly agreed to a year-to-year tenancy and that plaintiff, as a holdover tenant, was subject to the same terms and

---

1. The leases contained a clause which annually adjusted rental payments based upon the consumer price index.

2. Plaintiff also sought an order allowing it to maintain its existing sign on BSS's premises for the term provided in the National leases and enjoining BSS from removing its sign prior to expiration of that term.

conditions, including options, as it was under its prior tenancy. It stated: "Thus, the covenant requiring BSS to give plaintiff a first option on additional outdoor advertising was binding upon it and was breached by BSS when it entered into the agreement with defendant National during plaintiff's tenancy and without giving plaintiff the first option. BSS is liable to plaintiff for any damages sustained by plaintiff as a result of the breach." Defendant National was not a party before Special Term and, hence, was unaffected by its decision.

BSS appealed from Special Term's order but, due to lack of prosecution, the appeal was dismissed 10 months later. Although BSS moved to restore the appeal, it withdrew its motion a short time later.

Trial commenced in August, 1983. Plaintiff presented two witnesses at trial: George Peterson, its vice-president and general manager, and Allan Wigley, a certified public accountant. Peterson testified that traffic flow is a major consideration in determining where to locate outdoor signs and that, consequently, expressway locations, such as those along the Scajaquada Expressway, were the best sites for locating signs. Peterson stated that advertisers often requested expressway locations and that there are limits to the general availability of expressway locations in western New York. Peterson further testified that plaintiff had 1,400 outdoor signs, that from 1979 to 1981 the business averaged an over-all 85% occupancy rate and, that during the same period, expressway signs had a 96% occupancy rate. Peterson stated that since 1979 plaintiff had built three new signs along the Scajaquada and that the cost of a new sign would be approximately $20,000.

Wigley, a certified public accountant and business consultant, testified concerning the computation of plaintiff's claim of lost profits — the amount of profits plaintiff would have earned if it could have erected two signs with two faces near the Scajaquada under the same terms and conditions as National received from BSS. Wigley's analysis covered two time periods: first, September 1, 1979, the date National's signs were erected, to July 31, 1983, the month prior to trial; and, second, the remainder of the 16-year period of National's leases. Wigley reviewed plaintiff's records for all of its expressway signs and determined an average monthly rental per sign face for the period between September 1, 1979 and July 31, 1983. He opined that, because of its low vacancy rates on expressway signs, plaintiff would have earned this same average monthly rental on the two National signs.

Wigley then subtracted estimated lease rental expenses, based upon National's expenses, and estimated expenses which plaintiff would have incurred in erecting two additional signs from estimated lease rentals and determined that plaintiff would have made a net profit of approximately $74,800 in the period from September 1, 1979 to July 31, 1983. Based upon plaintiff's average monthly rental per sign face during the year prior to trial, Wigley estimated that plaintiff would have earned a total profit on the two signs of roughly $284,000 for the period from August 1, 1983 through April, 1995, the remainder of National's lease term with BSS. Wigley then discounted this stream of net profits to a present value of approximately $152,000.[3]

The trial court's decision initially recognized that the doctrine of law of the case precluded it from disregarding Special Term's determination of liability of BSS and stated that its only inquiry relative to plaintiff's claim against BSS was the amount of damages to which plaintiff was entitled. As to defendant National, however, the court noted that it had to decide both the issues of liability and, if necessary, damages. While it found that National either knew or should have known of plaintiff's first option rights, the court held that, due to the indefiniteness of the first option language in plaintiff's contract with BSS, defendant National was not liable for damages to plaintiff. As to defendant BSS, the court stated that, as a matter of law, plaintiff was not entitled to recover lost profits from BSS's breach. The court went on to state that, even if plaintiff were legally entitled to recover lost profits, the indefiniteness of the first option provision made the computation of profits too speculative. The court noted that, under established law, plaintiff was limited to recovering the difference between the actual rental value of the leased property and the rent reserved in the lease. Since plaintiff failed to present evidence on the actual rental value of the premises, the court awarded nominal damages of $1.

Plaintiff appeals from the trial court's judgment arguing that the trial court erred in determining that, as a matter of law, it was not entitled to recover lost profits for breach of the lease. Defendant BSS cross-appeals from Special Term's order granting plaintiff partial summary judgment and from so much of the trial court's judgment as awarded plaintiff nominal damages. Five issues are presented on this appeal: (1) whether BSS is entitled to contest Special Term's finding of liability; (2) whether plaintiff was entitled to recover lost profits for defendant BSS's breach; (3) whether the lease's first option clause is

---

**3.** Wigley used the prime interest rate in effect at the time to calculate present value.

enforceable; (4) whether plaintiff met its burden of proving lost profits; and (5) whether the trial court erred in finding that defendant National was not liable for damages.

The first issue presented is whether BSS is entitled to contest Special Term's liability determination. CPLR 5501 (subd [a], par 1) provides, in relevant part, that "[a]n appeal from a final judgment brings up for review * * * *any nonfinal* * * * order which necessarily affects the final judgment" (emphasis added). Since an order granting summary judgment is a final order which may not be reviewed on an appeal from the final judgment (*Acres v Hitchcock*, 77 AD2d 744), BSS is precluded from contesting on this appeal any of the issues determined by Special Term.

Moreover, even if Special Term's decision were reviewable on this appeal, I would conclude, as it did, that BSS breached the terms of its lease with plaintiff. BSS argues that the typewritten clause at the end of the lease containing the first option language applies only to the 50- by 20-foot strip of land that plaintiff leased. Plaintiff argues that the first option language was meant to be read in conjunction with the exclusivity clause and applies to any adjoining premises owned or controlled by BSS. Hence, plaintiff claims that defendant BSS breached the first option clause by not giving it the opportunity to match the lease terms agreed to by National.

To adopt BSS's interpretation of the first option language would render plaintiff's option wholly meaningless since it would only afford plaintiff the first option of erecting an additional sign on property that it had already leased and fully occupied. It is unlikely that the parties could have contemplated a third party, such as National, coming in and seeking to erect a new sign on that same plot. On the other hand, plaintiff's interpretation of the first option language reduces the effect, to some degree, of the exclusivity clause in the lease; plaintiff would only be the exclusive advertiser on the premises for as long as it chose to exercise its first option and match the offers of third parties. Nonetheless, established rules of contract interpretation compel adoption of plaintiff's interpretation of the disputed clause.

Ambiguous language must be construed against the drafter (*67 Wall St. Co. v Franklin Nat. Bank*, 37 NY2d 245); additionally, "[w]here * * * typewritten and printed portions of a lease are in conflict, the typewritten * * * portion will control the interpretation of the lease and will prevail over that which is printed, as it is presumed to convey with more accuracy the

latest intention of the parties" (33 NY Jur, Landlord and Tenant, § 83, p 384). Given that the first option clause was drafted by defendant BSS, that it was typed in at the end of the lease, and that plaintiff's interpretation is the only way to give practical effect to the first option language (see *Robshaw v Health Mgt.*, 98 AD2d 986), the first option clause should be broadly construed as applying to any property owned or controlled by BSS which lies adjacent to plaintiff's leasehold.

The second issue presented is whether plaintiff was entitled to recover lost profits for BSS's breach. The trial court held, as a matter of law, that plaintiff was not entitled to recover lost profits.

Courts of this State have long recognized the propriety of awarding lost profits as damages for breach of contract. In *Wakeman v Wheeler & Wilson Mfg. Co.* (101 NY 205, 211), the Court of Appeals stated: " 'The loss of profits is one of the common grounds, and the amount of profits lost one of the common measures of the damages to be given upon a breach of contract.' " Over the years, however, in actions brought by tenants to recover lost profits suffered as a result of the lessor's breach, a distinction developed between tenants who were in possession of their leasehold when the breach occurred and tenants who were not in possession prior to the breach. The former were allowed to recover lost profits (see, e.g., *R & I Electronics v Neuman,* 66 AD2d 836; *Myers v Sea Beach Ry. Co.,* 43 App Div 573, affd 167 NY 581; *Goldstein v 104 Second Ave. Realty Corp.,* 194 Misc 1), while the latter were not (see, e.g., *City of New York v Pike Realty Corp.,* 247 NY 245; *Dodds v Hakes,* 114 NY 260; *Shopwell Foods v Parkway Vil.,* 278 App Div 671; *Selmar Garage Corp. v Rink Realty Corp.,* 276 App Div 1019; *Kolodny v Schwartz,* 276 App Div 930; *Williamson v Stevens,* 84 App Div 518). Two reasons have traditionally been advanced in support of this distinction: that the calculation of lost profits is too uncertain and speculative where the tenant has not been in possession of the leasehold; and that the award of lost profits is usually not within the contemplation of the parties. Tenants were, thus, restricted to recovering "the value of the lease above the rent received or the difference between the rent received and the value of the premises for the time" (*City of New York v Pike Realty Corp., supra,* at p 249).

I agree with a growing number of courts and commentators that the fact a tenant has not taken possession of the leasehold should not, as a matter of law, preclude the tenant from seeking

lost profits (see, e.g., *Lee v Seagram & Sons,* 552 F2d 447, 455; *Lee Shops v Schatten-Cypress Co.,* 350 F2d 12, 16-18; *Fera v Village Plaza,* 396 Mich 639; Dunn, Recovery of Damages for Lost Profits 2d, § 2.24). The following rationale is persuasive:[4] "What the earlier cases perceived as a rule of law has been replaced * * * by a rule of evidence. The rule of evidence is far preferable. It is impossible for anyone, including an appellate court, to foresee all the possible situations in which meritorious claims could be asserted for lost profits even though the business to which those profits might accrue had not yet commenced operation. Nor is any worthwhile end to be achieved by permitting one party to breach his contracts with impunity — giving him an option, as it were — because the other party has not yet commenced operation. The trend of the modern cases is plainly toward replacing the old rule of law with a rule of evidence — the unquestionable principle that damages for loss of profits must be proven with reasonable certainty and that the evidence must support that finding by the trier of fact." (Dunn, *op. cit.,* § 4.2.) Plaintiff should, thus, be entitled to recover lost profits if it can demonstrate with reasonable certainty what those profits would have been and that lost profits were reasonably within the contemplation of the parties when they entered the lease.

Prior to reaching the question of the sufficiency of plaintiff's proof, it is necessary to address the third issue presented, whether the lease's first option clause is enforceable. Both defendants maintain that the first option clause is too indefinite to be enforced; specifically, defendants argue that the omission of material terms, such as price and length of the lease term, renders the first option provision unenforceable. Defendants' argument must fail in view of our decision in *Di Maria v Michaels* (90 AD2d 676). In *Di Maria,* the parties entered into a five-year lease which contained the following provision: "The parties further agree that the parties of the second part herein shall have first option to buy said premises at a price to be agreed upon in the event the party of the first part places the premises for sale." When plaintiff learned that defendant had contracted with a third party to sell the premises, plaintiff notified defendant that he intended to exercise his first option to buy. After plaintiff was granted summary judgment ordering defendant to deliver a deed to the premises upon plaintiff's

---

4. While this rationale is presented by the author to support the award of lost profits to a business which has not yet commenced operations, I believe it is equally applicable to a situation, such as that presented here, where a business has been denied the opportunity to extend its operations to a new location.

tender of the purchase price offered by the third party, defendant appealed on the ground that the language "at a price to be agreed upon" indicated that a material term was left for future negotiations and that, consequently, the option clause was too indefinite to be enforceable. In rejecting that argument, we stated: "[T]he term 'first option to buy' has a technical meaning, viz., that the lessor, upon receiving an acceptable offer for the property from a third party, must offer the property to the lessee upon the same terms * * * By inferring the price term from the technical meaning of the 'first option' language employed in the agreement, we read the clause as providing a definitely ascertained standard by which the price term may be determined and thus, unlike the 'agreement to agree' in *Martin Delicatessen* (*supra*), the first option clause here is enforceable" (*Di Maria v Michaels, supra,* at p 677).

Similarly, given my interpretation of the first option clause in the parties' lease, defendant BSS was obligated to offer plaintiff the opportunity to erect additional signs on its property pursuant to the same terms agreed to by defendant National. By referring to the terms agreed upon by BSS and National, as is contemplated by the first option language in plaintiff's lease with BSS, all necessary terms of the lease are supplied. The trial court, thus, erred in determining that the first option clause was too indefinite to be enforceable. Defendant's reliance on *Martin Delicatessen v Schumacher* (52 NY2d 105) is clearly misplaced. The renewal clause at issue in *Martin Delicatessen* provided that "[t]he Tenant may renew this lease for an additional period of five years at annual rentals to be agreed upon" (52 NY2d 105, 108, *supra*). While the court held that this renewal clause was too indefinite to be enforced, it specifically excepted this situation from one where the agreement invites recourse to an objective extrinsic event on which the amount was to depend (52 NY2d 105, 110-111, *supra*).

The fourth issue presented is whether plaintiff met its burden of proving lost profits. As previously noted, plaintiff had the burden of proving with reasonable certainty the amount of its lost profits and showing that lost profits were reasonably within the contemplation of the parties at the time they entered into the lease.

"Profit is computed as the amount the plaintiff would have realized under the contract if it had been faithfully carried out, less the necessary expense of performance on its part" (*R & I Electronics v Neuman, supra,* at p 838). Evidence of past performance has been held to provide a reasonable basis for future

earnings (*Lee v Seagram & Sons, supra*). Plaintiff's expert first testified concerning additional revenue plaintiff would have earned had it been able to erect two additional signs on defendant BSS's property along the Scajaquada. The trial court's decision implicitly recognized the reliability of plaintiff's estimates of revenue when it stated: "The uncertainty and speculation presented by plaintiff's computation of its claimed lost profits *does not emmanate [sic] from the nature of the business operation* it conducted on the BSS premises but rather from the indefiniteness which plagues the option provision upon which this action is predicated" (emphasis added). Plaintiff's expert then properly deducted the increased costs, including the costs of sign construction, to determine net profit. Finally, plaintiff's expert discounted, to present value, the stream of profits plaintiff would have received under National's lease in the years subsequent to trial. In sum, plaintiff's proof of lost profits was sufficient to meet its burden of proof. "As [lost profits] are prospective they must, to some extent, be uncertain and problematical, and yet on that account a person complaining of breach of contract is not to be deprived of all remedy" (*Wakeman v Wheeler & Wilson Mfg. Co., supra,* at p 210). Additionally, lost profits were clearly within the contemplation of the parties at the time they entered into the lease: "Most contracts are entered into with the view to future profits, and such profits are in the contemplation of the parties, and so far as they can be properly proved, they may form the measure of damage." (*Wakeman v Wheeler & Wilson Mfg. Co., supra,* at p 210.) Defendant BSS either knew or should have known that the only reason plaintiff entered into this lease was to make profits from leasing space on its billboards; likewise, the only benefit plaintiff could derive from exercising its first option to erect additional signs would be increased profits from the leasing of the additional space. Accordingly, plaintiff is entitled to $227,158.49, the amount of lost profits it established at trial.

Finally, as to defendant National, while I disagree with the trial court's finding that the first option clause in plaintiff's lease was unenforceable, I, nonetheless, agree with the court's conclusion that National was not liable for intentionally inducing BSS to breach its contract with plaintiff. Given my interpretation of the first option provision, that plaintiff had the option of matching any agreement to erect additional signs reached between BSS and a third party on adjacent property owned or controlled by BSS, there is nothing improper with a third party, such as National, entering into negotiations with BSS over the

erection of additional signs. Indeed, plaintiff's first option provision contemplates third-party offers. The mere fact that National may have had knowledge of plaintiff's first option rights suggests nothing improper about National's actions in this case; National was entitled to negotiate an agreement with BSS and, in the event plaintiff declined to match it, erect its signs upon BSS's property. Plaintiff's causes of action against defendant National were properly dismissed because plaintiff failed to present any evidence showing that National intentionally induced defendant BSS to breach its lease with plaintiff by not giving plaintiff the opportunity to erect additional signs on the same terms and conditions as were offered to National.

The judgment should be modified by awarding plaintiff the sum of $227,158.49 in damages and, as modified, affirmed, without costs.

DILLON, P. J., HANCOCK, JR., O'DONNELL and SCHNEPP, JJ., concur; MOULE, J., dissents and votes to modify the judgment in an opinion.

Judgment affirmed, without costs.