#24454-aff in pt, rev in pt & rem-SLZ

**2008 SD 10**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

LAMAR ADVERTISING OF
SOUTH DAKOTA, INC.,                          Plaintiff and Appellant,

    v.

HEAVY CONSTRUCTORS, INC.,                    Defendants and Appellees.

    and

EPIC OUTDOOR ADVERTISING, LLP,               Defendants.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

* * * *

HONORABLE JOHN J. DELANEY
Judge

* * * *

JOHN K. NOONEY of
Thomas, Nooney, Braun,
  Solay  & Bernard, LLP                       Attorneys for plaintiff
Rapid City, South Dakota                     and appellant.

DAVID E. LUST
AMY K. KOENIG of
Gunderson, Palmer, Goodsell
  & Nelson, LLP                             Attorneys for defendant
Rapid City, South Dakota                     and appellee.

* * * *

CONSIDERED ON BRIEFS
ON NOVEMBER 6, 2007

OPINION FILED **02/06/08**

#24454

ZINTER, Justice

[¶1.]      Lamar Advertising of South Dakota, Inc. appeals the circuit court's denial of Lamar's request for specific performance of a billboard/sign lease. In the alternative, Lamar appeals the circuit court's calculation of damages arising from Heavy Constructors, Inc.'s breach of the lease. We affirm the denial of specific performance, but reverse and remand for a new trial on damages.

[¶2.]      Lamar is engaged in the outdoor advertising business. The business involves leasing, purchasing, or otherwise acquiring rights to real property in order to construct billboard signs (hereinafter "sign" or "billboard") for lease to entities interested in advertising. Lamar's predecessor in interest obtained a permit to construct a sign on real property owned by Heavy Constructors' predecessor in interest. The sign was constructed in Rapid City, South Dakota, near an exit on an interstate highway that experiences a large traffic volume. Lamar acquired the lease from Heavy Constructors in 1998, and the parties renewed the lease for March 1, 1999 through March 1, 2009, at an annual rent of $1,000. The lease prohibited Heavy Constructors from allowing other billboards to be constructed within 1,000 feet of Lamar's sign. It also allowed Lamar to relocate its sign on Heavy Constructors' premises.[1]

_____

1.     The two provisions of the lease pertinent to this case are:

> [Heavy Constructors] hereby leases to [Lamar] . . . as much as the
> hereinafter described premises as may be necessary for the
> construction, repair, and relocation of . . . structures . . . to be situated
> at the approximate location(s) as shown below.
>
> . . .

(continued . . .)

-1-

[¶3.]        In late 2002, Epic Outdoor Advertising, LLP, also obtained leases for signs from Heavy Constructors on the same property.  Epic began construction of its signs in February of 2003.  Two of Epic's signs were constructed in violation of Lamar's 1,000 foot restriction:  one was 830 and the other 525 feet from Lamar's sign.  Heavy Constructors admitted that it made a mistake when it allowed Epic to construct the signs in violation of the 1,000 foot restriction.

[¶4.]        All parties attempted to negotiate a resolution.  During negotiations the parties learned that Lamar's sign had been inadvertently constructed on an unopened section line right-of-way.  Additionally, Rapid City annexed the property.  City officials ordered that the Lamar sign be removed from the section line.[2]  To further complicate matters, pre-existing county ordinances required only 500 feet between outdoor advertising signs, but the city ordinances required a 1,000 foot separation.  Consequently, there is no dispute that because of the city's restriction and without the removal of one or more of Epic's signs, Lamar was unable to

---

(. . . continued)

> [Heavy Constructors] agrees not to erect or allow any other off-premises advertising structures on property owned or controlled by [Heavy Constructors] within . . . 1,000 Feet of [Lamar's] advertising structure or to allow any other obstruction . . . that may obstruct the highway view of its advertising structure(s).  [Lamar] is hereby authorized to remove any such other advertising structure, obstruction or vegetation at its option.

2.        Lamar appealed to the Sign Code Board of Appeals and then to the City Council.  In February 2004, the City Council upheld the decision and ordered the sign removed.

relocate its sign on the property.[3]  Ultimately, despite the city's demand, Lamar

failed to remove the sign and Heavy Constructors removed it.

[¶5.]     Lamar subsequently brought this action against Heavy Constructors

and Epic seeking damages or specific performance requiring the removal of one or

more of the Epic signs so that Lamar could reconstruct its sign on Heavy

Constructors' property.  All parties moved for summary judgment.  The circuit court

ruled that:  Heavy Constructors allowed Epic to erect its signs in "direct . . .

violation of [Heavy Constructors'] responsibilities under its Lease with Lamar"; the

lease "clearly envisions and allows a potential relocation of [Lamar's] sign at the

discretion of [Lamar] in the vicinity of the existing sign," yet Lamar could not

---

3.     At the August 9, 2004 motions hearing, the circuit court inquired:

> Court:  I guess the first particular question I have is why can't Lamar
> relocate? . . . Is there a geographical impossibility of relocation[?]
> Epic:  Ordinances that now are in place, it's my understanding that
> Lamar can't --- given the property configurations, Lamar can't move
> their sign any place else on the [interstate] corridor on the property
> that would be --- meet the requirements with city ordinances.
>
> Court:  Why not?
>
> Epic:  It violates city ordinances.

Similarly, at the August 15, 2005 motions hearing, the court again inquired:

> Court:  Is there a practical impossibility of building the signs within
> the 1,000 feet if it's only parallel?
>
> Lamar:  Absolutely impossible to build a sign without a variance.
>
> Court:  Other side of the road?
>
> (continued . . .)

exercise its right to relocate its sign under the lease "solely because of the placement of the Epic signs." The court then requested briefing on Lamar's remedies.

[¶6.]     After a clarifying ruling, the court ultimately denied Lamar's request for specific performance and determined the measure of damages it would allow at trial. The court determined that Lamar would only be allowed damages for the difference between the fair market value of the unexpired term of the lease (market rent) and the rent reserved in the lease (the contract rent). This measure of damages is often referred to as the lease "bonus value." The court specifically ruled that "lost profits, income flow, and 'net operating income generated by the billboard' [were] not recoverable [as a matter of law,]" and evidence of those losses would not be permitted at trial. The circuit court reasoned that "[t]o whatever extent income or profits from the established signs can be considered in determin[ing] the fair market value of the lease, they have been appropriately considered in the bonus value. . . . I have not seen a single lease agreement between Lamar and any other lessor which remotely approaches the damages claimed." The circuit court continued, ". . . profits based upon third party contracts seem irrelevant to me in determining the fair market value of the leasehold between landowners and sign companies."

[¶6.]     Following these rulings, a trial date was scheduled, and the parties

_____

(. . . continued)
          Lamar:  Still can't build it. They already have signs up over there.
          You have to take down a sign to put up a sign and that's kind of
          contrary to the bottom line.

retained experts to calculate Lamar's damages. Lamar retained Dr. Rudolfo Aguilar,[4] and Heavy Constructors retained Ken Simpson, SRA. Aguilar prepared a detailed appraisal of Lamar's leasehold interest. He first calculated the lease's bonus value in accordance with the court's ruling. Aguilar opined that market rents in the area were $2,781 per month and Lamar's contract rent was $1,000 per month. He then calculated the present value of the difference (the bonus value) over the 102 months remaining on the lease, which was $10,950.48 (rounded to $11,000). In contrast, Simpson opined that there was no bonus value because he opined that market rents were $1,000 – the same as Lamar's contract rent. Because he opined the market rent and contract rent were equal, Simpson concluded that Lamar suffered no damages.

[¶7.] Aguilar's opinion of Lamar's damages was not limited to the bonus value. Aguilar also considered lost income based upon the leasing history of the sign. He specifically analyzed the sign's occupancy and rent history and Lamar's comparative statement of operations, including existing advertising contracts with third parties. Based upon that analysis, Aguilar opined that Lamar also suffered a loss of "net operating income generated by [Lamar's sign] [in] an additional $57,000." Ultimately, Aguilar opined that Lamar's total loss was $68,000 ($57,000 in lost net income plus $11,000 bonus value).

---

4. Aguilar was the Chairman, President and CEO of The Aguilar Group, Inc., a real estate consulting company. Aguilar received his Ph.D. in civil engineering and is a registered architect, a professional land surveyor, a clinical professor of business administration at Tulane University, and a certified general real estate appraiser.

[¶8.]     The parties submitted the issue of damages to the court on stipulated facts. After considering the parties' submissions, the court rejected Simpson's opinion of the lease's bonus value and adopted Aguilar's opinion on that issue. The circuit court did not, however, adopt Aguilar's opinion regarding Lamar's $57,000 loss of net income. The court therefore entered judgment for Lamar in the amount of $11,000. Lamar appeals, arguing that it was entitled to specific performance, or in the alternative, that the circuit court should have considered Aguilar's evidence of lost net income.

*Specific Performance*

[¶9.]     Lamar argues that the circuit court should have granted specific performance ordering Heavy Constructors to continue leasing the property to Lamar under the terms of its lease. This remedy would have required Heavy Constructors to remove one or more of the Epic signs in order for Lamar to relocate its sign under the city ordinances. The circuit court denied Lamar's request for specific performance on three grounds: laches, harm to a third party, and failure to demonstrate that the sign's location was sufficiently unique. We also observe that "[a]n essential element to equitable relief is the lack of an adequate remedy at law." Rindal v. Sohler, 2003 SD 24, ¶12, 658 NW2d 769, 772. "Specific performance is an equitable remedy and this [C]ourt's standard of review addresses whether there has been an abuse of discretion by the circuit court after reviewing the facts and circumstances of each case." Amdahl v. Lowe, 471 NW2d 770, 773 (SD 1991).

[¶10.]     To support the affirmative defense of laches in this case:

> [It] must be found that, (1) [Lamar] had full knowledge of the
> facts upon which the action is based, (2) regardless of this

> knowledge, [Lamar] engaged in an unreasonable delay before commencing this suit, *and* (3) that allowing [Lamar] to maintain the action would prejudice [Heavy Constructors and Epic].

Burch v. Bricker, 2006 SD 101, ¶15, 724 NW2d 604, 608.  The record reflects that Lamar drafted the renewal lease, and therefore had knowledge of its provisions.  Lamar also had knowledge of the Epic leases and the commencement of Epic's construction, but Lamar gave no notice of the lease violation until Epic's signs were substantially completed.  Although Lamar argues that it acted with reasonable diligence, the circuit court found that Lamar unreasonably delayed in providing notice of the violation until Epic's signs were substantially completed.  We agree.

[¶11.]     The circuit court also found that specific performance would result in unjust harm to an innocent third party – Epic – as Lamar would be attempting to enforce a remedy under a contract to which Epic was not a party.  The circuit court finally found that the claim for uniqueness was "questionable given the nature of Lamar's business."[5]  Considering these factors together with the fact that both parties' experts were able to calculate damages, the circuit court did not abuse its discretion in denying Lamar's request for specific performance.

---

5.     Considering the governmental regulations in existence, we question the circuit court's decision that the property was not unique, especially in light of the evidence that the sign could not be relocated.  In any event, for purposes of our review of the propriety of specific performance, we need not resolve the uniqueness issue because the circuit court's decision was supported by laches, harm to a third party, and the existence of an adequate remedy at law.

*Damages*

[¶12.] Lamar argues that the circuit court erred in refusing to even consider evidence of lost net income. This raises a question of law. "Conclusions of law are reviewed under a de novo standard of review and no deference is given to the trial court's conclusions of law." Melstad v. Kovac, 2006 SD 92, ¶6, 723 NW2d 699, 702.

[¶13.] Pursuant to SDCL 21-2-1, damages for breach of contract consist of the amount that will compensate the aggrieved party for all of the detriment caused by, and that are the likely result of, the breach. The statute provides:

> For the breach of an obligation arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom. No damages can be recovered for a breach of contract which are not clearly ascertainable in both their nature and their origin.

SDCL 21-2-1. *See also* Tri-State Refining and Inv. Co., Inc. v. Apaloosa Co., 431 NW2d 311, 315 (SD 1988) (citing SDCL 21-2-1 and concluding that the correct measure of damages for breach of a lease was the detriment to the lessee resulting from the breach of contract). The purpose of contract damages is to put the injured party in the same position it would have been had there been no breach. Bad Wound v. Lakota Comty. Homes, Inc., 1999 SD 165, ¶9, 603 NW2d 723, 725. To recover damages for breach of contract, the loss must, however, "be clearly ascertainable in both its nature and origin." McKie v. Huntley, 2000 SD 160, ¶18, 620 NW2d 599, 603. "In proving damages, the party must also establish 'a reasonable relationship between the method used to calculate damages and the amount claimed.'" FB&I Bldg. Prod., Inc. v. Superior Truss & Components, A Div.

of Banks Lumber, Inc., 2007 SD 13, ¶20, 727 NW2d 474, 480 (citing *McKie,* ¶18, 620 NW2d at 603). The damages must also be reasonably certain and not speculative. Olson v. Andren, 84 SD 292, 299, 170 NW2d 891, 895 (1969).

[¶14.] This Court has recognized the propriety of awarding lost profits as damages for breach of contract. *See* Table Steaks v. First Premier Bank, N.A., 2002 SD 105, 650 NW2d 829 (concluding lost profits were admissible in restaurant's action against bank and credit card company alleging breach of contract); Arcon Const. Co., Inc. v. S.D. Cement Plant, 382 NW2d 668 (1986) (concluding contractor was entitled to amend complaint for lost profits resulting from breach of contract); and Atyeo v. Paulsen, 319 NW2d 164 (SD 1982) (concluding that the jury should have been instructed on provable lost income that resulted from the lessor's breach of a farm lease).

[¶15.] The right to recover lost income as a measure of damages has also been recognized in breach of contract cases involving signs or billboards. In *Whitmier & Ferris Co., Inc. v. Buffalo Structural Steel Corp.*, 482 NYS2d 927, 104 AD2d 277 (NYAD 1984), a billboard company sought damages from a property owner for breach of a billboard lease. The billboard company sought lost income based on the monthly rental of two comparable parcels that the property owner subsequently leased for outdoor advertising to a third party. The trial court held that as a matter of law, the lessee was not entitled to recover lost profits, but was limited to recovering the difference between the actual rental value of the lease and the rental reserved in the lease (the bonus value). The New York Supreme Court, Appellate Division, affirmed the judgment because *factually*, the lessee could not prove such

damages for a "suppositious" third party lease that could never have been in the contemplation of the property owner and the lessee.[6] The court disagreed, however, with the lower court's conclusion that *as a matter of law*, a lessee cannot recover lost profits in such cases. *Id*. at 928, 104 AD2d at 278.

[¶16.] Similarly,*Van Wagner Adver. Corp. v. S&M Enter.*, 67 NY2d 186, 501 NYS2d 628, 492 NE2d 756 (NY 1986), involved a lessee who suffered damages for breach of a lease for advertising space. In its damage assessment, the superior court awarded damages that included consideration of lost revenues on existing advertising contracts. The New York Court of Appeals affirmed the admissibility of lost revenues, stating, "it is hardly novel in the law for damages to be projected in the future[,] [p]articularly where the value of commercial billboard space can be readily determined by comparison with similar uses[.]" *Id.* at 194, 501 NYS2d at 633, 492 NE2d at 760.

[¶17.] Heavy Constructors, however, argues that South Dakota does not allow for the recovery of lost profits or revenues under any circumstances. It relies on *City of Sioux Falls v. Naused*, 88 SD 303, 218 NW2d 536 (1974), a case in which the City of Sioux Falls condemned property that had been leased to an equipment company. In reviewing the trial court's measure of damages, this Court did state

---

6. In reaching this conclusion, *Whitmier* noted that the parties could not have reasonably contemplated that the property owner would be responsible "for loss of profit damages for breach of a suppositious lease, the terms of which could not, if ever, be known until some future time when [lessee] might negotiate with a third party." *Id*. at 929, 104 AD2d at 279 (emphasis added). In this case, however, it is undisputed that Lamar had *existing* contracts with third parties.

that the measure of damages for a leasehold interest is the bonus value; i.e. "the difference between the fair rental value of the leased premises for the unexpired term of the lease and the rent reserved in the lease." *Id*. at 306, 218 NW2d at 538. In *Naused*, however, there was no claim for lost income, nor was there any contention that the leasehold was not replaceable.

[¶18.]    Similarly, *State Highway Comm'n v. Foye* involved a condemnation proceeding in which the parties stipulated to the amount of just compensation due to the property owners for the taking. 87 SD 206, 205 NW2d 100 (1973). The only issue on appeal was the apportionment between the owners of the property and the tenant. This Court considered the value of the leasehold interest and whether the tenant was entitled to its cost of improvements on the property. In determining damages, we stated, "under the prevailing view a loss of profits sustained by a lessee by reason of the taking is not recoverable as an element of damages." *Id*. at 210, 205 NW2d at 102. Again, however, that tenant did not claim lost profits, nor does the opinion reflect that the leasehold was not replaceable.

[¶19.]    Moreover, it must be emphasized that this is a breach of contract case involving contract damages. As indicated in both *Naused* and *Foye*, condemnation cases involve the fair market value of a leasehold interest. That measure of damages is different. South Dakota Constitution art. 6 § 13, provides, in relevant part:

> Private property shall not be taken for public use, or damaged, without just compensation[.] No benefit which may accrue to the owner as the result of an improvement made by any private corporation shall be considered in fixing the compensation for property taken or damaged. . . . .

As the text suggests, condemnation cases deal with determining "just compensation" for the *value* of the property at the time of the taking. *See* Krier v. Dell Rapids Tp., 2006 SD 10, ¶21, 709 NW2d 841, 846. In contrast, Lamar is entitled damages for breach of contract in an amount that will compensate it for all of the detriment caused by, *and* which is the likely result of, the breach. SDCL 21-2-1. Therefore, the trial court erred in focusing on cases that involved just compensation for the value of an interest in real estate[7] when Lamar's claim is for

---

7.    Even a substantial body of condemnation cases conclude that lost net income is recoverable for an advertising sign if the sign cannot be relocated. In *Nat'l Adver. Co. v. State, Dep't of Transp.*, 116 Nev 107, 993 P2d 62 (2000), Nevada sought to acquire property for the construction of a freeway extension. Advertising companies, whose billboards were removed, sought compensation for the value of their leasehold interests. The Nevada Supreme Court reversed a circuit court's conclusion that the measure of value of the leasehold interest was limited to the bonus value. The Nevada court rejected a measure that was limited to bonus value and adopted the income approach when billboards cannot be relocated to comparable, income-generating sites. In so doing, the court noted the importance of location in the ability of a billboard to generate advertising income and the difficulty in relocating billboards under restrictive regulations. *Id.* at 113, n4, 993 P2d at 66 n4 (citing 8A Nichols on Eminent Domain §23.03[5][a], at 37-42 (3d ed. 1997, 1998)).

In this case it is undisputed that Lamar's billboard could not be relocated on Heavy Constructors' premises. Furthermore, both parties' arguments to the circuit court suggested that in view of the current governmental sign restrictions, Lamar's billboard may not be relocatable in that area. Where governmental ordinances prevent or restrict relocation of billboards, damages are to include the total value of the leasehold interest. Nat'l Adver. Co. v. State, Dep't. of Transp., 611 So2d 566, 570 (FlaDistCtApp 1992). As the Nevada Supreme Court explained:

> The income generated from the billboards should have been considered in determining the value of the [advertising company's] leasehold interests. The bonus value approach does not sufficiently compensate the [advertising company] for their leasehold interests. As noted by the district court, the bonus

(continued . . .)

#24454

contract damages, which includes all detriment proximately caused including that

likely to result from the breach.

_____

(. . . continued)

> value approach is based on the assumption that the [advertising company] may keep the benefit of their bargain with the [lessor] if they can relocate their billboards under a comparable lease at market value to another comparable site. The evidence in this case, however, clearly establishes that these billboards were invaluable, unique locations, and that the billboards could not be relocated to a comparable site within the market area.

116 Nev at 114 n6, 993 P2d at 67 n6. *Nat'l Adver.* cited a number of other cases supporting this view:

> City of Scottsdale v. Eller Outdoor Adver. Co. of Arizona, 119 Ariz. 86, 579 P2d 590, 596-98 (CtApp 1978) (concluding that the income approach is the best method of valuation only when a billboard cannot be relocated in a given market area because billboard locations are unique and it is virtually impossible to separate location from the structure, even though the billboard is deemed personal property under the lease); Nat'l Adver. Co. v. Florida Dept. of Transp., 611 So2d 566, 569-70 (FlaCtApp 1992) (concluding that billboard replacement cost was insufficient compensation where a billboard's location was unique and it could not be relocated; the condemnor should have presented evidence of income in valuing the leasehold interest); City of Norton Shores v. Whiteco Metrocom, 205 MichApp 659, 517 NW2d 872, 873 (MichCtApp 1994) (concluding that condemned leaseholds were income-producing property for which income capitalization method was a valid means of estimating market value, regardless of whether the billboards were trade fixtures or personal property); State of Minnesota v. Weber-Connelly, Naegele, Inc., 448 NW2d 380, 383, 384-85 (MinnCtApp 1989) (concluding that a state statute permits compensation for lost rental income, and that the income approach for appraising billboards is proper because the property was income producing and the billboards could not be relocated).

*Id.* at 114, 993 P2d at 67, n6.

[¶20.]    Nevertheless, Heavy Constructors contends that under *Peter Kiewit Sons' Co. v. Summit Const. Co.*, 422 F2d 242 (8thCir 1969), anticipated lost revenues or profits are not recoverable in an action for breach of contract. In *Peter Kiewit*, a subcontractor brought a claim for anticipated lost profits. Unlike Lamar's case, however, the subcontractor not only claimed that it was entitled to profits that it would have received had the contract not been breached, but also profits "from other contracts and such other business as it *might have secured.*" *Id.* at 275 (emphasis added). The Eighth Circuit rejected this claim, finding it "conjectural and speculative at best." *Id.* at 276. This reasoning has support in billboard cases: those where the future income and damages are speculative. *See* Florida Outdoor, Inc. v. Stewart, 318 So2d 414 (FlaDistCtApp 1975) (holding that where there was no evidence to support the assumption that the rental of a billboard would have continued had it not been torn down, the trial court's award for anticipated loss profits was improper); Tri-State Sys., Inc. v. Village Outlet Stores, Inc., 135 GaApp 81, 217 SE2d 399 (GaCtApp 1975) (holding that store owner's allegations of damages, which included "generalized statements" that he improved and expanded his store and increased inventory was speculative, and therefore the evidence failed to provide a rational basis of computation). Like *Peter Kiewit*, other billboard cases have disallowed future profits where no evidence supported the claim. *See, i.e.,* Nat'l Adver. Co. v. Wilson Auto Parts, Inc., 569 NE2d 997 (IndCtApp 1991) (noting that the record contained no evidence of any lost revenue because of the breach of contract); and Dep't of Transp. v. El Carlo Motel, Inc., 140 GaApp 779, 232 SE2d

126 (GaCtApp 1976) (reversing the trial court, noting that it was error to allow recovery of lost profits when no evidence of loss profits was provided).

[¶21.]     We also disallow conjectural and speculative damages. *See* Basin Elec. Power Coop. v. Poindexter, 305 NW2d 46, 49 (SD 1981), and Neb. Elec. Generation & Trans. Coop. v. Tinant*,* 90 SD 284, 291-92, 241 NW2d 134, 138 (1976). Aguilar's appraisal, however, was based upon existing contracts that Lamar executed with third parties and historical evidence of net income. Therefore, unlike *Peter Kiewit's* consideration of lost profits that the subcontractor "might have secured," Aguilar considered Lamar's actual income. In such cases involving actual leases, revenues and expenses, lost profits are a proper measure of damages for at least the period of the contract. *See Van Wagner Adver. Corp.,* 67 NY2d at 194, 501 NYS2d at 633, 492 NE2d at 760. For these reasons, *Peter Kiewit* is inapposite.

[¶22.]     Finally, Heavy Constructors argues that *In re Urban Redevelopment Auth. of Pittsburgh**, Allegheny County*, 440 Pa 321, 272 A2d 163 (1970), supports its view that future lost net income should not be considered when calculating damages. In that case, the Supreme Court of Pennsylvania held that a billboard company's loss of future income was irrelevant in determining the fair market value of a leasehold. *Id.* at 325, 272 A2d at 165. Again, however, that was a condemnation case, and Pennsylvania adopted a statute on condemnation that specifically disallowed evidence of lost profits. Further, in that case, the court assumed that the billboard could be relocated "for the same amount of rent, [and Outdoor could] construct its billboards at [the new] location with the award for the replacement value of the billboards and realize an identical income flow." *Id.* at

326, 272 A2d at 165. Because of its reliance upon the condemnation statute and its assumption on relocation, *Urban Redevelopment* is inapposite.

[¶23.]    We ultimately conclude that the circuit court erred in holding as a matter of law that evidence of lost net income is not admissible in a contract action involving the breach of an unexpired billboard lease. "Our case law has long emphasized that the 'object of compensatory damages is to make the injured party whole[,]'" and we do not favor the adoption of "blanket rule[s]" that exclude evidence of damages without first considering the circumstances in which those damages occurred. O'Bryan v. Ashland, 2006 SD 56, ¶21, 717 NW2d 632, 639 (citations omitted). Instead, we examine those circumstances to determine whether the claim is "remote, speculative, or uncertain." City of Winner v. Bechtold Inv., Inc., 488 NW2d 416, 419 (SD 1992) (citing *Basin Elec. Power Coop.*, 305 NW2d at 49 (quoting *Neb. Elec. Generation & Trans. Coop.*, 90 SD at 291-92, 241 NW2d at 138)). Although many breach of contract cases involving billboards have concluded that anticipated loss of net income is too speculative, "the law recognizes an exception . . . when such loss of profits is shown to a reasonable certainty by competent proof." *Florida Outdoor Inc.,* 318 So2d at 415. Therefore, on remand, Lamar is entitled to attempt to prove a reasonably certain loss of net income by competent proof. Should Lamar prove entitlement to lost net income, we leave it to the circuit court to determine whether an additional award of bonus value would result in improper duplicate compensation.

[¶24.]    Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

#24454

[¶25.] GILBERTSON, Chief Justice, and SABERS, KONENKAMP, and MEIERHENRY, Justices, concur.